MOSDOS CHOFETZ CHAIM, INC., Yeshiva Chofetz Chaim, Inc., Rabbi James Bernstein, Moshe Ambers, Rabbi Mayer Zaks, and Rabbi Aryeh Zaks, Plaintiffs,

v.

VILLAGE OF WESLEY HILLS, The Mayor and the Board of Trustees of the Village of Wesley Hills, Robert H. Frankel, in his individual and official capacity, Edward B. McPherson, in his individual and official capacity, David A. Goldsmith, in his individual and official capacity, Robert I. Rhodes, in his individual and former official capacity, Jay B. Rosenstein, in his individual and former official capacity, Village of New Hempstead, the Mayor and the Board of Trustees of the Village of New Hempstead, Robert A. Moskowitz, Trustee of the Village of New Hempstead in his individual and former official capacity, Village of Pomona, The Mayor and Board of Trustees of the Village of Pomona, Former Mayor Herbert I. Marshall, in his individual and former official capacity, Mayor of Pomona Nicholas L. Sanderson, in his individual and offi-

cial capacity, Village of Chestnut Ridge, the Mayor and the Board of Trustees of the Village of Chestnut Ridge, Mayor Jerome Kobre, Mayor of the Village of Chestnut Ridge, in his individual and official capacity, Trustee Howard L. Cohen, in his individual and official capacity, Village of Montebello, Mayor and Board of Trustees of the Village of Montebello, Kathryn Ellsworth a/k/a Kathryn Gorman, in her individual and former official capacity, Mayor of Montebello Jeffrey Oppenheim, in his individual and official capacity, and John Doe 1–37, Defendants.

Case No. 08–CV–156 (KMK).

United States District Court, S.D. New York.

March 31, 2010.

Joseph J. Haspel, Esq., Joseph J. Haspel, PLLC, Goshen, NY, for Plaintiffs.

Reuben S. Koolyk, Esq., Arnold & Porter, LLP, New York, NY, for Plaintiffs.

Andrew F. Pisanelli, Esq., Milber Makris Plousadis & Seiden, LLP, White Plains, NY, for Defendants Village of Pomona, Mayor and Board of Trustees of the Village of Pomona, Herbert I. Marshall, and Nicholas L. Sanderson.

Michael David Zarin, Esq., Zarin & Steinmetz, White Plains, NY, for Remaining Defendants.

KENNETH M. KARAS, District Judge:

Plaintiffs Mosdos Chofetz Chaim, Inc. ("Mosdos"), Yeshiva Chofetz Chaim, Inc.

("YCC"), Rabbi James Bernstein ("Bernstein"), Moshe Ambers ("Ambers"), Rabbi Mayer Zaks ("Mayer Zaks"), and Rabbi Aryeh Zaks ("Aryeh Zaks") (collectively, "Plaintiffs") filed this action against Defendants the Village of Wesley Hills ("Wesley Hills"), the Mayor and the Board of Trustees of Wesley Hills, Robert H. Frankel, Edward B. McPherson, David A. Goldsmith, Robert I. Rhodes, Jay B. Rosenstein (together, the "Wesley Hills Defendants"), the Village of New Hempstead ("New Hempstead"), the Mayor and Board of Trustees of New Hempstead, Robert A. Moskowitz (together, the "New Hempstead Defendants"), the Village of Pomona ("Pomona"), the Mayor and Board of Trustees of Pomona, Herbert I. Marshall, Nicholas L. Sanderson (together, the "Pomona Defendants"), the Village of Chestnut Ridge ("Chestnut Ridge"), the Mayor and Board of Trustees of Chestnut Ridge, Jerome Kobre, Howard L. Cohen (together, the "Chestnut Ridge Defendants"), the Village of Montebello ("Montebello"), the Mayor and Board of Trustees of Montebel-

lo, Kathryn Ellsworth a/k/a Kathryn Gorman, Jeffrey Oppenheim (together, the "Montebello Defendants"), and John Does 1–37 (collectively, "Defendants"). Plaintiffs allege claims under 42 U.S.C. § 1982 ("§ 1982"), 42 U.S.C. § 1983 ("§ 1983"), and 42 U.S.C. § 1985 ("§ 1985") for violations of and conspiracy to violate their rights under the Free Exercise and the Free Assembly Clauses of the First and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment, as well as claims under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), the Fair Housing Act, 42 U.S.C. § 3604 *et seq.* ("FHA"), the New York State Constitution, Article I, §§ 3 & 11, and New York Civil Rights Law Section 40-c. Plaintiffs seek injunctive and compensatory relief.[1]

Wesley Hills Defendants, New Hempstead Defendants, Chestnut Ridge Defendants, and Montebello Defendants move to dismiss this action pursuant to Federal

---

**1.** Specifically, as explained in more detail below, Plaintiffs' allegations of religious discrimination and interference with their First Amendment rights fall into three main categories. First, Plaintiffs allege that certain Defendants filed a lawsuit in New York state court challenging the Plaintiffs' religious housing project because of environmental concerns. (Compl. ¶¶ 71–75, 104–05.) Plaintiffs allege that the environmental concerns were a "pretext," and that the real purpose of the lawsuit was to intimidate Plaintiffs and to prevent Plaintiffs from building their religious student housing project on account of Plaintiffs' religion. (*Id.* ¶¶ 71, 74–75, 104–05.) Next, Plaintiffs object to Defendants' zoning laws, alleging that the Defendant Villages were incorporated in order to "provide local zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities." (*Id.* ¶¶ 79, 100, 107, 119, 122.) For example, Plaintiffs allege that New Hempstead Defendants adopted zoning regulations in order to "create enormous difficulty" for the Orthodox and Hasidic com-

munities (*id.* ¶ 98), that Pomona Defendants enacted restrictive zoning laws for the purpose of unfairly discriminating against, and restricting the religious assembly and speech of, the Jewish community (*id.* ¶¶ 101–03), and that the other Defendants enacted similarly discriminatory zoning laws or aided in the effort to violate Plaintiffs' Constitutional and statutory rights, (*id.* ¶¶ 108–17, 120, 122). Lastly, Plaintiffs allege that New Hempstead Defendants made false representations to federal, state, and local government agencies regarding environmental contamination on Plaintiffs' property in order to "thwart the Yeshiva's development and religious use" of the property. (*Id.* ¶¶ 80–97.) Plaintiffs also allege that these false allegations "chill[ed] community relations and creat[ed] an environment of fear and hatred towards the Yeshiva and the local Hasidic community" (*id.* ¶ 92), and were part of a continuous pattern of action by Defendants to discriminate against Plaintiffs and to prevent the construction of their religious housing project, (*id.* ¶ 97).

Rules of Civil Procedure 12(b)(1), 12(b)(6), and 13(a). Pomona Defendants move to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the Court grants Defendants' Motions and dismisses this case without prejudice.

## I. Background

### A. Factual Background

For the purpose of resolving the instant Motions, the Court accepts as true all facts alleged in Plaintiffs' Complaint.

#### 1. The Parties

Plaintiffs are religious corporations and individuals affiliated with the Chofetz Chaim sect of the Orthodox Jewish community, all of whom allege an interest in the operation of Kiryas Radin, "a religious educational institution and center for religious activity and prayer," at a location known as the Nike Site.[2] (Compl. ¶¶ 4, 8–13, 40.) Plaintiff Mosdos is a religious corporation that owns the Nike Site. (Id. ¶ 8.) Plaintiff YCC, also a religious corporation, is the former owner of the Nike Site, and it has partnered with Mosdos to operate Kiryas Radin. (Compl. ¶¶ 31–33.) See Vill. of Chestnut Ridge v. Town of Ramapo, No. 07–CV–9278, 2008 WL 4525753, at *5 (S.D.N.Y. Sept. 30, 2008) ("Chestnut Ridge II "). Plaintiffs Aryeh Zaks and Meyer Zaks are individuals who are religious leaders of the YCC, and Plaintiffs Bernstein and Ambers are individuals who seek to study and live at Kiryas Radin. (Compl. ¶¶ 10–13.) Defendants are five Villages (the "Village Defendants") located within the Town of Ramapo ("Ramapo"), as well as current and former officials of each of those Villages (the "Individual Defendants"). (Id. ¶¶ 14–30.) Plaintiffs have filed this action to challenge alleged discriminatory conduct by Defendants, which Plaintiffs argue violate their civil rights. (Id. ¶¶ 1–5.)

#### 2. The Village Incorporation Movement

Beginning in the 1970s, Orthodox and Hasidic Jewish families "began to reside in [Ramapo] in increasing numbers." (Id. ¶ 45.) According to Plaintiffs, the influx of Orthodox and Hasidic Jews to Ramapo and its surrounding areas prompted a "village incorporation movement," in which residents of Ramapo "began to establish villages for the purpose of controlling who resided within each village." (Id. ¶¶ 45–46 (internal quotation marks omitted).) Defendant Villages Montebello, Chestnut Ridge, Wesley Hills, and New Hempstead were allegedly formed as part of this movement. (Id. ¶ 46.) Specifically, Plaintiffs contend that "[t]he purpose of the village formation movement was to exercise control over zoning and planning and not provide for or otherwise accommodate" the increasing Orthodox and Hasidic Jewish population. (Id. ¶ 47.) While Plaintiffs do not allege that Defendant Pomona was incorporated as part of this movement, Plaintiffs allege that Pomona also was "incorporated to . . . provide local zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities." (Id. ¶ 100.)

#### 3. Defendant Villages' Allegedly Discriminatory Zoning

Plaintiffs allege that Defendants have enacted discriminatory zoning provisions with the purpose of excluding members of the Orthodox Jewish community. (Id. ¶¶ 98, 101–03, 117, 119, 122.) New Hempstead's zoning code is allegedly "designed to create enormous difficulty for ultra reli-

---

**2.** As this Court noted in its decision in Village of Chestnut Ridge v. Town of Ramapo, No. 07–CV–9278, 2008 WL 4525753 (S.D.N.Y. Sept. 30, 2008), "[t]he name Nike Site derives . . . from the land's former use as a U.S. Army base for Nike Hercules surface-to-air missiles." Id. at *1 n. 2.

gious and Hasidic Jews to reside within its boundaries." (*Id.* ¶ 98.) Pomona's zoning laws are also allegedly discriminatory, as they "prevent Yeshivas of any form or kind from coming into their jurisdiction" and exclude "religious assemblies" from their jurisdiction. (*Id.* ¶¶ 101–03.) Likewise, Wesley Hills, Chestnut Ridge, and Montebello have allegedly promulgated "zoning regulations inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities." (*Id.* ¶¶ 107, 119, 122.) Finally, Plaintiffs allege that Wesley Hills has implemented land use regulations designed to "keep out ultra religious and Hasidic people." (*Id.* ¶ 117.)

### 4. The Prior New Hempstead Litigation

YCC purchased the Nike Site from the federal government around May 30, 1997. (Def. Vills. of Chestnut Ridge, Montebello, Wesley Hills, and New Hempstead's ("Def. Vills.'") Ex. C, Stipulation and Order of Dismissal, *Yeshiva Choeftz Chaim Radin, Inc. v. Vill. of New Hempstead,* No. 97–CV–4021 (S.D.N.Y. Dec. 14, 2000) 2). At the time, the Nike Site was under the jurisdiction of New Hempstead. (*Id.* at 1.)

Around the time YCC purchased the Nike Site, New Hempstead officials allegedly "informed various government agencies," including the Occupational Safety & Health Administration, the United States Army Corps of Engineers, and the Environmental Protection Agency, that the Nike Site was contaminated with lead and friable asbestos. (Compl. ¶ 81.) During the same time period, New Hempstead officials also allegedly notified the East Ramapo Local School Board "that the work involved in renovating the property would endanger the young lives attending the Colton School," which is located near the Nike Site. (*Id.* ¶ 84.) Further, New Hempstead officials allegedly notified the New York State Department of Environmental Conservation ("DEC") that the Nike Site was unsafe due to the presence of asbestos. (*Id.* ¶ 88.) Plaintiffs allege that the New Hempstead officials' representations to these government bodies were false and that they "were made to thwart [YCC's] development and religious use" of the Nike Site. (*Id.* ¶¶ 82–90.) Indeed, the "DEC [allegedly] evaluated the property and found no merit behind" the claims. (*Id.* ¶ 91.) Nonetheless, Plaintiffs allege that the representations by New Hempstead officials "had the effect of chilling community relations and creating an environment of fear and hatred towards [YCC] and the local Hasidic community." (*Id.* ¶ 92.)

On June 2, 1997, YCC filed suit ("the Prior New Hempstead Litigation") against New Hempstead, its Mayor, its Board of Trustees, and its Deputy Building inspector, alleging, inter alia, that New Hempstead had incorporated as a village in 1984 in order to "exercise control over zoning and planning and not accommodate the housing needs or religious practices of ultra-Orthodox Jews." (Def. Vills.' Ex. B, Compl., *Yeshiva Choeftz Chaim Radin, Inc. v. Vill. of New Hempstead,* No. 97–CV–4021 (S.D.N.Y. June 2, 1997) ¶¶ 24–25.) YCC's complaint in the Prior New Hempstead Litigation further alleged that New Hempstead had adopted exclusionary zoning provisions that excluded multi-family homes from its boundaries. (*Id.* ¶¶ 25–26.) The complaint did not include any claims regarding New Hempstead's aforementioned false representations, which Plaintiffs assert in the instant action.

On December 14, 2000, Magistrate Judge Lisa Margaret Smith so ordered a stipulation of settlement between all parties to the Prior New Hempstead Litigation (the "New Hempstead Stipulation"). (Def. Vills.' Ex. C.) In the New Hempstead Stipulation, the Parties agreed that the Nike Site would be transferred from the

jurisdiction of New Hempstead to the jurisdiction of Ramapo, including its zoning code. (*Id.* at 3.) The Parties agreed that the Stipulation would be "full, final and with prejudice." (*Id.* at 4.)

5. *Revisions to Ramapo's Zoning Code*

In 2001, Ramapo initiated a review of its Comprehensive Zoning Law ("CZL"), and, according to Plaintiffs, determined that the Orthodox and Hasidic Jewish population in the jurisdiction were in need of adequate housing. (Compl. ¶¶ 49–53.) To address this issue, Ramapo proposed to revise its CZL to re-zone for multi-family use certain areas previously zoned for single-family use. (*Id.* ¶ 54.) In addition, in spring 2004, Ramapo proposed a local law, the Adult Student Housing Law ("ASHL"), "to permit, as a conditional use, the construction and operation of 'adult student living facilities' in certain residential zones." *Vill. of Chestnut Ridge v. Town of Ramapo,* 45 A.D.3d 74, 841 N.Y.S.2d 321, 326 (2007) ("*Chestnut Ridge I* ").

Plaintiffs allege that during the "period of review and comment on" the revised CZL, Defendants "started an organized campaign to defeat and block the [revised CZL] and the [ASHL] from adoption." (Compl. ¶¶ 64–67.) Defendants "complained about the [ ][p]lan based upon issues of density," despite "approv[ing] the development of over one thousand multi-family, high-density units in their own respective [V]illages" and "over eight senior units" located in Ramapo, neither of which was related to the Orthodox or Hasidic Jewish community. (*Id.* ¶ 56.) Wesley Hills Defendants allegedly advocated,

through an organization called "Preserve Ramapo," to prevent Plaintiffs from using the Nike Site for its religious purpose. (*Id.* ¶¶ 108–116.) Further, New Hempstead Defendants allegedly made false representations regarding environmental problems at the Nike Site to federal, state, and local agencies. (*Id.* ¶¶ 76, 81–97.) They also allegedly "used racist remarks and racial stereotyping to install fear and misinformation" about the revised CZL. (*Id.* ¶ 66.) In particular, Plaintiffs allege that Rhodes, a former Trustee of Wesley Hills, made discriminatory public statements about the Orthodox Jewish community on more than one occasion. (*Id.* ¶¶ 108–09, 115.)

 Defendants' actions notwithstanding, Ramapo enacted the ASHL, Local Law No. 9–2004, on June 15, 2004. *See Chestnut Ridge I,* 841 N.Y.S.2d at 327; *see also Chestnut Ridge II,* 2008 WL 4525753, at *1. Sometime after passage of the ASHL, YCC—then the owner of the Nike Site—applied for site plan approval for construction of an adult student housing facility on the Nike Site.[3] (Compl. ¶ 70.) In November 2004, Ramapo's Planning Board ("Planning Board") issued a negative declaration under New York's State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law ("ECL") § 8–0101 *et. seq.,* in connection with YCC's application, "determining that the construction of the facility would not have a significant adverse impact on the environment and thus did not require the preparation of an" environmental impact statement ("EIS").[4] *Chestnut Ridge II,*

---

3. YCC had first submitted its site plan for the Nike Site to Ramapo in 2001, but the original plan was rejected, as the then-existing dormitory zoning ordinance would not "fit housing for married students." (Compl. ¶ 60.)

4. "The primary purpose of SEQRA is 'to inject environmental considerations directly

into governmental decision making.' " *Akpan v. Koch,* 75 N.Y.2d 561, 555 N.Y.S.2d 16, 554 N.E.2d 53, 56 (1990) (quoting *Coca–Cola Bottling Co. of N.Y. v. Bd. of Estimate of the City of N.Y.,* 72 N.Y.2d 674, 536 N.Y.S.2d 33, 532 N.E.2d 1261, 1263 (1988)); *see also Oyster Bay Assocs., Ltd. P'ship v. Town Bd. of the*

2008 WL 4525753, at *1. Around the same time, Ramapo also adopted the revised CZL. *See Chestnut Ridge II*, 2008 WL 4525753, at *1; *Chestnut Ridge I*, 841 N.Y.S.2d at 327.

### 6. The Chestnut Ridge Action

On October 13, 2004, four of the Defendants in this action—the Villages of Chestnut Ridge, Montebello, Pomona, and Wesley Hills (the "Four Village Plaintiffs")—along with two individual residents of Ramapo (the "Individual *Chestnut Ridge* Plaintiffs") (collectively, the "*Chestnut Ridge* Plaintiffs"), commenced a proceeding in New York Supreme Court, Westchester County (the "*Chestnut Ridge* Action") challenging the enactment of the ASHL, pursuant to Article 78 of the New York Civil Practice Law and Rules ("N.Y.C.P.L.R."). *See Chestnut Ridge I*, 841 N.Y.S.2d at 327. The defendants named in the *Chestnut Ridge* Action were Ramapo, the Ramapo Town Board, the Ramapo Planning Board, the Ramapo Board of Appeals, YCC, and Scenic Development, LLC, a developer involved with the Nike Site (the "*Chestnut Ridge* Defendants"). *See id.* The *Chestnut Ridge* Plaintiffs later filed an amended petition, adding claims challenging the enactment of the revised CZL and the approval of YCC's Nike Site plan. *See id.* at 327.

On June 13, 2005, the New York Supreme Court granted an injunction to the two Individual *Chestnut Ridge* Plaintiffs, but dismissed the Four Village Plaintiffs' claims, holding, inter alia, that they lacked standing to raise their claims. *See Chestnut Ridge II*, 2008 WL 4525753, at *5. On August 14, 2007, the Second Department reversed, holding that (1) the Four Village Plaintiffs had standing to raise their challenges to the ASHL and the CZL under SEQRA and New York General Municipal Law Section 239–m, and that (2) the Village of Wesley Hills had standing to challenge the issuance of the negative declaration regarding YCC's site plan under SEQRA. *See Chestnut Ridge I*, 841 N.Y.S.2d at 333. The Second Department then remanded the case back to the Supreme Court. *See id.* at 341.[5] Thereafter,

---

*Town of Oyster Bay*, 58 A.D.3d 855, 874 N.Y.S.2d 492, 496 (2009) (same). To that end, a decision-making agency is obligated "to identify the relevant areas of environmental concern, take a hard look at them, and make a reasoned elaboration of the basis for its determination." *Save The Pine Bush, Inc. v. Common Council of the City of Albany*, 56 A.D.3d 32, 865 N.Y.S.2d 365, 373 (2008) (internal quotation marks and brackets omitted), *rev'd on other grounds*, 13 N.Y.3d 297, 890 N.Y.S.2d 405, 918 N.E.2d 917 (2009); *see also Oyster Bay Assocs.*, 874 N.Y.S.2d at 496. Typically, SEQRA "mandates the preparation of an [EIS] when a proposed development project 'may have a significant effect on the environment.'" *Akpan*, 554 N.E.2d at 56 (quoting ESL § 8–109(2)), *leave to appeal denied by*, 12 N.Y.3d 716, 884 N.Y.S.2d 691, 912 N.E.2d 1072 (2009). If the agency "determines that there will be 'no adverse environmental impacts from the action or that the identified adverse environmental impacts will not be significant,' a negative declaration may

be issued and the preparation and circulation of an EIS is not required." *City of Middletown v. Town Bd. of Town of Wallkill*, 54 A.D.3d 333, 863 N.Y.S.2d 52, 56 (2008) (quoting *N.Y. City Coal. to End Lead Poisoning, Inc. v. Vallone*, 100 N.Y.2d 337, 763 N.Y.S.2d 530, 794 N.E.2d 672, 677 (2003)) (internal brackets omitted).

**5.** In deciding that the *Chestnut Ridge* Plaintiffs had standing to raise these claims, the Second Department determined that: (1) with respect to claims under New York General Municipal Law Section 239–m, which intends to "bring pertinent inter-community and countywide planning, zoning, site plan, and subdivision considerations to the attention of neighboring municipalities and agencies having jurisdiction[,] ... adjoining municipalities necessarily have the ... interest" required to confer standing under the statute; (2) with respect to claims challenging the ASHL and CZL under SEQRA, the Village Plaintiffs, as neighboring municipalities, had sufficiently

on September 11, 2007, the Supreme Court issued a temporary restraining order ("TRO") enjoining implementation of the ASHL and occupation of the Nike Site. *See Chestnut Ridge II*, 2008 WL 4525753, at *5. After the TRO was issued, Mosdos was added as a party to that litigation.[6] *See Chestnut Ridge II*, 2008 WL 4525753, at *5 (describing the circumstances in which Mosdos was added as a defendant to the *Chestnut Ridge* Action).[7]

On December 8, 2009, the New York Supreme Court issued an unpublished decision resolving many of issues raised in the hybrid Article 78 proceeding. *See Vill. of Chestnut Ridge v. Town of Ramapo* [hereinafter *Chestnut Ridge III*], No. 16876–2004, at 20 (N.Y.Sup.Ct. Dec. 10, 2009). For example, the Court rejected the challenges to the ASHL based on alleged SEQRA violations. *Id.* at 3–8. Specifically, the Supreme Court held that Ramapo's "determination to issue a negative declaration was neither arbitrary and capricious nor irrational, and that [Ramapo] identified the relevant areas of environmental concern, took the required 'hard look' and provided a reasoned elaboration for its [negative] determination." *Id.* at 6. The Supreme Court similarly rejected SEQRA-based objections to the CZL

adopted by Ramapo. *Id.* at 8–10. Also rejected were the claims that the ASHL amounted to impermissible spot zoning, *id.* at 10–12, that the ASHL violated the Municipal Home Rule Law, *id.* at 13, that the ASHL violated the General Municipal Law, *id.* at 14, and that the Ramapo Town Board's actions in adopting the ASHL and the CZL were *ultra vires*, *id.* at 14–15. However, the Supreme Court held that the Ramapo Town Board had violated SEQRA when it issued the negative declaration as to the Nike Site, specifically noting that the Board had failed to take the required "hard look" at several areas of environmental concern, including the increased density on the character of the surrounding (Wesley Hills) community, the traffic impact of the planned use of the Nike Site, as well as the public sewer and water impacts. *Id.* at 15–19.

In the instant action, Plaintiffs allege that the filing of the *Chestnut Ridge* Action was motivated by Defendants' discriminatory animus against Orthodox Jews. (Compl. ¶¶ 71, 104–05.) According to Plaintiffs, "[a]lthough the pretext of the lawsuit is environmental concerns, the goal ... is to prevent the spread of the Orthodox and Hasidic communities through intimidation." (*Id.* ¶ 71.) Plaintiffs allege

---

"established a demonstrated interest in the potential environmental impacts of the [ASHL] sufficient to give them SEQRA standing;" and (3) with respect to challenges under SEQRA to the negative declaration issued on YCC's site plan, only Wesley Hills established a "demonstrated interest in the potential environmental impacts" to establish standing. *Chestnut Ridge I*, 841 N.Y.S.2d at 334–39 (internal quotation marks omitted). On April 2, 2009, the New York Court of Appeals denied the *Chestnut Ridge* Defendants' request for leave to appeal. *See Vill. of Chestnut Ridge v. Town of Ramapo*, 906 N.E.2d 1072 (N.Y. 2009).

6. The TRO was modified to permit Mosdos to apply for certificates of occupancy for sixteen

housing units and a synagogue upon a $75,000 undertaking.

7. After it learned that YCC had conveyed the deed to the Nike Site to Mosdos in December 2005, the New York Supreme Court directed the *Chestnut Ridge* Plaintiffs to substitute Mosdos as a defendant in the case. *See Chestnut Ridge II*, 2008 WL 4525753, at *5. The plaintiffs did so, and thereafter, Mosdos removed the *Chestnut Ridge* Action to federal court, where it was assigned to this Court. *See id.* In an Opinion and Order issued on September 30, 2008, this Court granted the *Chestnut Ridge* Plaintiffs' motion to remand the *Chestnut Ridge* Action to the New York Supreme Court. *See id.* at *14.

that the *Chestnut Ridge* Action was intended "to impede the development of [the Nike Site] through the use of the judicial process." (*Id.* ¶ 77.) Plaintiffs further allege that the Individual Defendants "were instrumental" to the decision of the Four Village Plaintiffs to pursue the *Chestnut Ridge* Action. (*Id.* ¶ 72.) Indeed, according to Plaintiffs, "[t]he retention of counsel and the prosecution of [the *Chestnut Ridge]* litigation [was] ... done to further [the Individual Defendants'] personal agendas." (*Id.* ¶ 73.) At bottom, Plaintiffs claim that Defendants' filing of the *Chestnut Ridge* Action violated their federal Constitutional rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, as well as their rights under RLUIPA and the FHA, Article I of the New York State Constitution, and New York Civil Rights Law Section 40–c.

### B. Procedural History

Plaintiffs filed their Complaint in this action on January 8, 2008. (Dkt. No. 1.) On July 7, 2008, Wesley Hills Defendants, New Hempstead Defendants, Chestnut Ridge Defendants, and Montebello Defendants filed a Motion to Dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 13(a). (Dkt. No. 31.) On July 8, 2008, Pomona Defendants filed a separate Motion to Dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (respectively, "Rule 12(b)(1)" and "Rule 12(b)(6)"). (Dkt. No. 35.)

### II. Discussion

#### A. Standard of Review

##### 1. Rule 12(b)(1)

Where, as here, "[a] court [is] presented with a motion to dismiss under both [Federal Rule of Civil Procedure] 12(b)(1) and 12(b)(6)[, it] must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Homefront Org., Inc. v. Motz,* 570 F.Supp.2d 398, 404 (E.D.N.Y.2008) (internal quotation marks omitted); *see also Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009) ("[S]tanding ... is intended to be a threshold issue at least tentatively decided at the outset of the litigation."); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387–88 (2d Cir.1997) ("Whether a claimant has standing is 'the threshold question in every federal case, determining the power of the court to entertain the suit.'") (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim if it "lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (internal quotation marks omitted), *cert. granted,* —— U.S. ——, 130 S.Ct. 783, 175 L.Ed.2d 513 (2009). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005). In deciding a Rule 12(b)(1) motion to dismiss, the Court " 'must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' " *Morrison,* 547 F.3d at 170 (quoting *Natural Res. Def. Council v. Johnson,* 461 F.3d 164, 171 (2d Cir.2006)) (citation and internal quotation marks omitted), but " 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it,' " *id.* (quoting *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003)). In deciding the motion, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may

not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir.2004); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings.").

### 2. Rule 12(b)(6)

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted) (second alteration in original). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (internal citation omitted) (quoting Fed.R.Civ.P. 8(a)(2)) (alteration in original)).

### B. Standing

■ To satisfy Article III's standing requirements, Plaintiffs must show that (1) they have "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir.2008) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2011, 173 L.Ed.2d 1088 (2009). It is the burden of the party invoking federal jurisdiction to establish these three elements. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. However, "at the pleading stage, standing allegations need not be crafted with precise detail." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir.2003) (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

### 1. Injury in Fact

■ To demonstrate an injury in fact, Plaintiffs must allege an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks and citations omitted); *see also Pac. Capital*

*Bank,* 542 F.3d at 350. To show that an injury is "concrete and particularized," Plaintiffs must allege "that [they] personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of" Defendants. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation marks omitted); *see also Lujan,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130 ("[T]he injury must affect the plaintiff in a personal and individual way."). For an injury to be "actual or imminent," Plaintiffs must show "that [they] ha[ve] sustained or [are] immediately in danger of sustaining some direct injury," *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (internal quotation marks omitted), that is not "conjectural or hypothetical," *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks omitted); *see also Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir.2006). "Allegations of possible future injury do not satisfy the requirements of Art[icle] III." *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). Instead, the threat of future injury must be "sufficiently real and immediate [so as] to show an existing controversy." *Lyons,* 461 U.S. at 103, 103 S.Ct. 1660 (internal quotation marks omitted).

■ Mosdos and YCC argue that they have suffered "clear[ ], . . . demonstrable harm" from the delay in their ability to operate Kiryas Radin. (Mem. of Law in Opp. to Defs.' Mot. to Dismiss ("Pls.' Mem.") 11.) The Court agrees. Specifically, Plaintiffs Mosdos and YCC have sufficiently alleged that they personally and actually suffered injury, as they jointly claim an interest in operating Kiryas Radin on the Nike Site, and they have been barred from doing so, despite spending money and undertaking other efforts to complete construction on the Site. (Pls.' Mem. 11.) *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 261–63, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that developer had sufficiently alleged an injury in fact where it had contracted to purchase land subject to allegedly exclusionary zoning laws, and "expended thousands of dollars" on its plans and the studies submitted in support of its plans, and where the zoning laws would prevent its plans from moving forward); *see also Conn. Zebra Club LLC v. City of Norwalk,* No. 99–CV–1624, 1999 WL 1427311, at *3 (D.Conn. Dec. 15, 1999) (holding that plaintiff properly established an "injury in fact sufficient to meet the requirements of standing" where the challenged government action would prohibit the use for which plaintiff had leased property and where plaintiff had already received health, zoning, and building permits and had expended funds to renovate the property for its use). Moreover, Plaintiffs Mosdos and YCC, as parties to the *Chestnut Ridge* action, have expended (and continue to expend) resources to litigate that case.

■ Plaintiffs Bernstein and Ambers also have sufficiently alleged an injury in fact, as they allege that they plan to study and live at Kiryas Radin, but are barred from doing so. (Compl. ¶¶ 12–13.) Specifically, based on these allegations and those of Mosdos and YCC, the Court finds that there is a substantial probability that Bernstein and Ambers will be able to live and study at Kiryas Radin if they get the relief they seek. *See Vill. of Arlington Heights,* 429 U.S. at 264, 97 S.Ct. 555 (concluding that individual who sought to live in planned housing community had sufficiently alleged an injury in fact where he claimed that his efforts to obtain housing in the defendant-village was "thwarted

by official action"); *ACORN v. County of Nassau*, No. 05–CV–2301, 2006 WL 2053732, at *11 (E.D.N.Y. July 21, 2006) (determining that individuals had alleged an injury in fact where they sought affordable housing in the defendant-locality, a developer sought to develop a specific project that would provide that affordable housing, and the locality's zoning ordinances prevented construction).

■ In contrast, Plaintiffs Aryeh Zaks and Meyer Zaks have failed to allege that they have personally suffered any injury from the delay in Plaintiffs Mosdos's and YCC's ability to operate Kiryas Radin, as required to show an injury in fact. For example, they do not allege that they intend to work, teach, or study at Kiryas Radin. Nor do they allege any other basis for finding that they themselves have been injured personally by the delay in the operation of Kiryas Radin. While both these Plaintiffs generally allege that they are "religious leaders of the [YCC]" (Compl. ¶¶ 10–11), the Court is aware of no authority, and the Plaintiffs have cited none, that confers standing on the leaders of a religious corporation based on the religious corporation's injury. *See Alternate Fuels, Inc. v. Cabanas*, 538 F.3d 969, 973 (8th Cir.2008) ("[A] corporate officer cannot maintain a personal action against a third party for harm caused to the corporation, unless the officer alleges a direct injury not derivative of the company's injury."); *Dore v. Wormley*, 690 F.Supp.2d 176, 185–87 (S.D.N.Y.2010) (finding that leader of a religious congregation lacked standing to sue in her personal capacity for misrepresentation and misuse of the congregation's funds because the alleged injuries were

suffered by the congregation and not by the plaintiff); *see also Yonkers Comm'n on Human Rights v. City of Yonkers*, 654 F.Supp. 544, 553–54 (S.D.N.Y.1987) (noting that the chairman of a political commission lacked standing to sue regarding the revocation of the commission's funds when the chairman did not allege any deprivation of his own personal property rights). As Plaintiffs Aryeh Zaks and Meyer Zaks have failed to allege a sufficiently particularized injury in fact, they lack standing to pursue this action, and, accordingly, their claims are dismissed.[8]

### 2. Causation and Redressability

■ A plaintiff "satisf[ies] the causation requirement [of Article III] if the complaint 'avers the existence of an intermediate link between the ... [challenged government action] and the injury.'" *Pac. Capital Bank*, 542 F.3d at 350 (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir.1992)) (internal brackets omitted). However, a plaintiff need not allege that a defendant's challenged actions were the very last step in a chain of events leading to an alleged injury. *See Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (noting that the " 'fairly traceable' " requirement does not demand that "the defendant's actions [be] the very last step in the chain of causation"); *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 192 (2d Cir.2002) (same). Nevertheless, to show causation, a plaintiff must at least plead facts indicating that a defendant's actions had a "determinative or coercive effect upon the action of someone else" who directly caused the alleged injury. *Bennett*, 520 U.S. at 169, 117 S.Ct. 1154; *see also Ctr. for Reprod.*

---

**8.** Because the Court dismisses Mayer Zaks and Aryeh Zaks as Plaintiffs in this action, all references hereinafter made to "Plaintiffs" refer only to Plaintiffs Mosdos, YCC, Bernstein, and Ambers. It bears noting, however, that

even if Mayer Zaks and Aryeh Zaks had standing, the other grounds for dismissal of Plaintiffs' claims, which are discussed below, would apply to them as well.

*Law,* 304 F.3d at 192. Causation, for example, is lacking when "the injury alleged is not fairly traceable to the Government conduct ... challenge[d] as unlawful." *Allen v. Wright,* 468 U.S. 737, 757, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see, e.g., M.J. Entm't Enters., Inc. v. City of Mount Vernon,* 234 F.Supp.2d 306, 311 (S.D.N.Y. 2002) (holding that causation was lacking where the injury would occur even in the absence of the challenged law).

The redressability requirement demands that there is a " 'non-speculative likelihood that the injury can be remedied by the requested relief.' " *Coal. of Watershed Towns v. EPA,* 552 F.3d 216, 218 (2d Cir.2008) (quoting *W.R. Huff,* 549 F.3d at 106–07), *cert. denied,* —— U.S. ——, 129 S.Ct. 2879, 174 L.Ed.2d 580 (2009). To meet this standard, a plaintiff must allege facts that show that it is " 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' " *Id.* at 218 (quoting *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 269, 128 S.Ct. 2531, 2542, 171

L.Ed.2d 424 (2008) ("Th[e] inquiry focuses, as it should, on whether the injury that a plaintiff alleges is likely to be redressed through the litigation ...." (emphasis omitted)).

■ Here, Plaintiffs have sufficiently alleged that their injuries were caused by the pursuit of the *Chestnut Ridge* Action by Wesley Hills Defendants, Pomona Defendants, Chestnut Ridge Defendants, and Montebello Defendants. For example, Plaintiffs Mosdos and YCC adequately allege that they have been injured by having to expend resources litigating the *Chestnut Ridge* Action. In addition, the filing of the *Chestnut Ridge* Action and the resulting issuance of the TRO prevented Kiryas Radin from operating on the Nike Site, thereby causing Plaintiffs' alleged injuries. The redressability requirement of the standing analysis also is met because the injuries allegedly caused by the filing of the *Chestnut Ridge* Action could be redressed at a minimum through compensatory damages, which Plaintiffs have requested.[9] There-

9. Plaintiffs also request injunctive relief to "restrain[ ] Defendants, their officers, agents, employees, and attorneys from enforcing or endeavoring to prohibit Plaintiffs from using" the Nike Site "as a place of worship." (Compl. 26.) However, the Court is without authority to enjoin the *Chestnut Ridge* Action or the enforcement of the TRO, as the Anti–Injunction Act, 28 U.S.C. § 2283, "abso-lute[ly] prohibit[s] ... any injunction of any state-court proceedings, unless the injunction falls within one of the three specifically defined exceptions in the Act, which courts must construe 'narrowly.' " *Bosch v. Lamattina,* No. 08–CV–238, 2008 WL 4820247, at *6 (E.D.N.Y. Nov. 4, 2008) (internal quotation marks omitted); *see also Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 145–46, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988) (noting that "[a] court of the United States may not grant an injunction to stay proceedings in a State Court," unless the injunction is permitted by one of the narrowly construed statutory exceptions (quoting 28 U.S.C. § 2283)). This

bar applies whether the injunctive relief would interfere either directly or indirectly with pending state proceedings. *See County of Imperial v. Munoz,* 449 U.S. 54, 59–60, 101 S.Ct. 289, 66 L.Ed.2d 258 (1980) (holding that a federal court may not enjoin a state proceeding by restraining the parties from participating in the proceeding); *Atl. Coast Line R.R. Co. v. Bd. of Locomotive Eng'rs,* 398 U.S. 281, 287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970) (noting that the Anti–Injunction Act "cannot be evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding"). Here, none of the three exceptions to the Anti–Injunction Act, which apply only when such an injunction is "expressly authorized by Act of Congress, ... necessary in aid of [the Court's] jurisdiction, or [necessary] to protect or effectuate its judgments," is applicable. 28 U.S.C. § 2283. Plaintiffs do not argue otherwise. Accordingly, the Court cannot grant the injunctive relief Plaintiffs seek, and, therefore, the Court considers herein the validity of

fore, Plaintiffs have adequately alleged causation and redressability with respect to their claims based on the filing of the *Chestnut Ridge* Action.

■ To the extent Plaintiffs seek to challenge the Defendant Villages' allegedly discriminatory zoning laws, however, Plaintiffs have not adequately alleged a link between those zoning laws and their claimed injuries. Plaintiffs generally allege that Defendants designed their zoning laws to keep the Orthodox Jewish community out of the Villages. (Compl. ¶¶ 98, 101, 117, 119, 122.) However, Plaintiffs have not alleged that they suffered any injury in fact as a result of Defendants' allegedly discriminatory zoning laws. For example, Plaintiffs have not alleged that they have "a present interest in any ... property" within the Villages, that they are personally "subject to the [challenged] ordinance[s]," or that they have "been denied a variance or permit by ... officials" of the Defendant Villages. *Warth*, 422 U.S. at 504, 95 S.Ct. 2197; *see also Regensberger v. City of Waterbury*, 04–CV–1900, 2008 WL 3992650, at *7 (D.Conn. Aug. 25, 2008) (holding that plaintiff had not alleged an injury in fact where it had not yet submitted its site plan for review, and, therefore, it had not been "adversely affected" by the law). Nor have Plaintiffs alleged that they have concrete plans to take any action within the Defendant Villages that would subject them to the Vil-

lages' zoning laws in the immediate future. *Cf. Vill. of Arlington Heights*, 429 U.S. at 264, 97 S.Ct. 555 (holding that plaintiffs sufficiently alleged an injury where plaintiff-developer had contracted to purchase land subject to those zoning policies and there was a particular non-speculative project planned); *ACORN*, 2006 WL 2053732, at *11 (holding that plaintiffs had alleged an injury in fact where plaintiff-developer had concrete plans to build on a site that was subject to allegedly exclusionary zoning laws). Plaintiffs argue that they have standing to challenge the allegedly discriminatory zoning laws of the Defendant Villages because the "claim of standing to interfere in projects outside [the Defendant Villages'] borders was partially accepted by the Appellate Division in *Chestnut Ridge*." (Pls.' Mem. 12.) Contrary to Plaintiffs' argument, however, the *Chestnut Ridge* Plaintiffs' standing to pursue the *Chestnut Ridge* Action under SEQRA and the New York General Municipal Law against Ramapo and the developers of the Nike Site is irrelevant to Plaintiffs' standing to pursue all of their claims in this case. *See generally DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ("[Parties] must demonstrate standing for each claim [they] seek[ ] to press.").[10]

■ Also, nothing in Plaintiffs' Complaint suggests that the Villages' zon-

Plaintiffs claims for compensatory damages only. It bears noting, however, that even if Plaintiffs could obtain injunctive relief, the Court would dismiss Plaintiffs' claims for the reasons set forth below. *See infra* Section II.D.

10. The Court notes that Plaintiffs' Complaint only asserts that the zoning laws were unconstitutional as applied to Plaintiffs because the restrictiveness of the laws unfairly discriminated against the Orthodox community and the building of yeshivas. (Compl. ¶ 98) (asserting that New Hempstead's zoning laws

were "designed to create enormous difficulty for ultra religious and Hasidic Jews"); *id.* ¶ 101 (asserting that Pomona's zoning laws "unfairly discriminat[ed] against people of the Jewish faith"); *id.* ¶¶ 107, 119, 122 (asserting that the other Village Defendants' zoning laws were "inconsistent with the religious practices of the Orthodox and Hasidic Jewish communities.") Thus, Plaintiffs have not asserted any potential facial challenge to the zoning laws, and, therefore, the Court need not consider such a claim.

ing laws have had any impact on the delay in operation of Kiryas Radin on the Nike Site. Indeed, it is clear from the face of Plaintiffs' Complaint that the Nike Site is not subject to the zoning laws of any of the Defendant Villages, as the Nike Site falls under Ramapo's sole jurisdiction, as provided in the New Hempstead Stipulation. (Compl. ¶¶ 8, 40; Def. Vills.' Ex. C.) *See M.J. Entm't Enters.*, 234 F.Supp.2d at 311 (holding that causation was lacking where challenged zoning ordinance "d[id] not apply to the . . . [z]oning [d]istrict where [the plaintiffs' property] [was] located").[11]

11. To the extent Plaintiffs seek to challenge the zoning laws of Defendant New Hempstead (to which the Nike Site was subject prior to entry of the New Hempstead Stipulation), those claims are barred by the doctrine of res judicata. An "order of dismissal [will] . . . bar [an] action by way of *res judicata*, [if] four factors [are] satisfied . . . .[:] '[the] earlier decision [must be] (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action.' " *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, 562 F.3d 516, 520 (2d Cir.2009) (quoting *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007)). Here, there is no question that the elements of res judicata are met. "Under both federal and New York law, any dismissal of an action 'with prejudice,' including a stipulation of dismissal of discontinuance with prejudice, is a final judgment for res judicata purposes." *Harris v. Beth Isr. Med. Ctr.*, No. 08–CV–11029, 2009 WL 612498, at *6 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 367 Fed.Appx. 184, 2010 WL 605743 (2d Cir. Feb. 22, 2010); *see also Modular Devices, Inc. v. Alcatel Alenia Space Espana*, No. 08–CV–1441, 2009 WL 749907, at *3 (E.D.N.Y. Mar. 16, 2009) (" '[A] decree of settlement will be given full res judicata effect in a subsequent suit between' the parties and on the claims 'compromised in the settlement.' " (quoting *Cahill v. Arthur Andersen & Co.*, 659 F.Supp. 1115, 1120 (S.D.N.Y.1986)) (internal ellipsis omitted)), *aff'd*, 822 F.2d 14 (2d Cir.1987). The New Hempstead Stipulation, which was so ordered by Magistrate Judge Smith on December 15, 2000, states on its face that it was "full, final and with prejudice." (Def. Vills.' Ex. D.) As Plaintiffs concede, it "clearly [intended] to extricate the [Nike] [S]ite from the land use authority of the Village [of New Hempstead] and transfer decision-making with respect to zoning and local land use issues to Town of Ramapo authorities." (Pls.' Mem. 22.) Therefore, Plaintiff YCC, a party to the New Hempstead litigation, is barred from pursuing claims based on the zoning laws of New Hempstead that were applicable to the Nike Site prior to entry of the New Hempstead Stipulation.

Likewise, Plaintiffs Mosdos, Bernstein, Ambers are barred from pursuing these claims, as these Plaintiffs constitute persons in privity with YCC. "*Res judicata* [ ] bar[s] non-parties to earlier litigation . . . when the interests involved in the prior litigation are virtually identical to those in later litigation." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir.1995). "Under New York and federal law, concepts summarized by the term privity are looked to as a means of determining whether the interests of the party against whom claim preclusion is asserted were represented in prior litigation." *Id.* "Under New York State law, the term 'privity' includes 'those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action.' " *Kesten v. E. Sav. Bank*, No. 07–CV–2071, 2009 WL 303327, at *5 (E.D.N.Y. Feb. 9, 2009) (quoting *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir.1997) (internal quotation marks omitted)). These categories of relationships are not exhaustive, however, as " '[t]here is no bright line rule' as to whether privity exists for *res judicata* purposes." *Akhenaten v. Najee, LLC*, 544 F.Supp.2d 320, 328 (S.D.N.Y.2008) (quoting *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir.1987)). The core question is whether the parties' "incentives to pursue [the] lawsuit were substantially similar." *Chase Manhattan Bank*, 56 F.3d at 346. Here, privity exists between Mosdos and YCC because YCC deeded the Nike Site to Mosdos in December 2005, *see Chestnut Ridge II*, 2008 WL 4525753, at *5, thereby making Mosdos a successor to YCC's property interest in the Nike Site. *See Yeiser v. GMAC Mortgage Corp.*, 535 F.Supp.2d 413, 423 (S.D.N.Y.2008) (holding that successor in interest to a mortgage was in privity with original mortgage holder). As Mosdos and YCC both seek to

Nor have Plaintiffs shown an adequate link between Plaintiffs' claimed injury and the allegedly false representations made by New Hempstead Officials to federal, state, and local government agencies in or around 1997 and 2004. (Compl. ¶¶ 76, 81–97.) By Plaintiffs' admission, the bulk of these representations were never credited by government officials. (*Id.* ¶¶ 76, 91.) Moreover, the Complaint contains no allegations suggesting that any federal, state, or local agencies acted to delay operation of Kiryas Radin on the basis of the allegedly false representations. Therefore, there are insufficient allegations linking these alleged actions by New Hempstead Officials to Plaintiffs' alleged injuries to confer standing on Plaintiffs to pursue these claims.[12] Because Plaintiffs have failed to demonstrate that they have standing to pursue any of their claims against New Hempstead Defendants, all claims against those Defendants—New Hempstead, the Mayor and Board of Trustees of New Hempstead, and Robert A. Moskowitz—are hereby dismissed.[13]

Plaintiffs Mosdos, YCC, Bernstein, and Ambers therefore have standing to pursue their claims against Wesley Hills Defen-

---

build and operate Kiryas Radin on the Nike Site, they share substantially similar incentives in bringing suit against Defendants that allegedly have acted to prevent the construction and operation of Kiryas Radin. Likewise, privity exists between YCC and Plaintiffs Bernstein and Ambers because Bernstein's and Ambers's interest in the operation of Kiryas Radin on the Nike Site was adequately represented in the New Hempstead Litigation by YCC. *See Ellentuck v. Klein,* 570 F.2d 414, 425–26 (2d Cir.1978) (finding that property owners were in privity with homeowner association when the association represented homeowners in the previous litigation).

12. In any event, Plaintiffs could not pursue claims based on alleged false representations made in 1997 and 2004 under §§ 1982, 1983, and 1985 as such claims would be time barred by the applicable three-year statute of limitations. *See Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (citing N.Y. C.P.L.R. § 214(5)) (noting that the statute of limitations for § 1983 claims in New York is three years); *Bishop v. Henry Modell & Co.,* No. 08–CV–7541, 2009 WL 3762119, at *5 (S.D.N.Y. Nov. 10, 2009) (noting that the statute of limitations for § 1985 claims is three years); *Carl v. City of Yonkers,* No. 04–CV–7031, 2008 WL 5272722, at *6 (S.D.N.Y. Dec. 18, 2008) (noting that the statute of limitations for § 1983 claims in New York is three years), *aff'd,* 348 Fed.Appx. 599 (2d Cir.2009); *Bacon v. Suffolk Legislature,* No. 05–CV–4307, 2007 WL 2288044, at *5 (E.D.N.Y. Aug. 8, 2007) (applying three-year statute of limitations to claims under § 1982); *see generally Wallace v. Kato,* 549 U.S. 384, 387–88, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (holding that actions under § 1983 are subject to the general state statute of limitations for personal injury actions); N.Y. C.P.L.R. § 214(5) (setting a three-year statute of limitations in personal injury actions). While accrual of claims under §§ 1982 and 1983 does not begin until " 'plaintiff[s] know or ha[ve] reason to know of the injury which is the basis of [their] action,' " *Brown v. Capoziello,* No. 03–CV–8712, 2008 WL 4201636, at *4 (S.D.N.Y. Sept. 12, 2008) (quoting *Pearl,* 296 F.3d at 80), *see also Wallace,* 549 U.S. at 388, 127 S.Ct. 1091 (holding that under federal law, a § 1983 claim accrues "when the plaintiff has a complete and present cause of action ... that is, when the plaintiff can file suit and obtain relief" (internal quotation marks and citations omitted)), Plaintiffs do not allege any reason for the Court to infer that these purported claims accrued later than 2004. Accordingly, these claims were time barred by the time Plaintiffs filed their Complaint in January 2008.

13. Because the Court dismisses New Hempstead Defendants in this action, hereinafter "Defendants" refers only to Wesley Hills Defendants, Pomona Defendants, Chestnut Ridge Defendants, and Montebello Defendants. The term "Village Defendants" hereinafter refers only to the Villages of Wesley Hills, Pomona, Chestnut Ridge, and Montebello. References hereinafter made to "Individual Defendants" refers to the officials and former officials of the Villages of Wesley Hills, Pomona, Chestnut Ridge, and Montebello named as Defendants in this action.

dants, Pomona Defendants, Chestnut Ridge Defendants, and Montebello Defendants solely for their pursuit of the *Chestnut Ridge* Action.[14]

### C. Failure to Allege Compulsory Counterclaims

▮▮▮▮▮ Defendants argue that Plaintiffs Mosdos and YCC are barred from pursuing their claims against the Village Defendants because those claims should have been filed as compulsory counterclaims in the *Chestnut Ridge* Action under Federal Rule of Civil Procedure 13 ("Rule 13"). For the following reasons, this Court agrees. Plaintiffs Mosdos and YCC filed their Answer in the *Chestnut Ridge* Action on October 19, 2007, three days after Mosdos removed the case to federal court. *See* Answer and Counterclaims, *Chestnut Ridge II* (S.D.N.Y. Oct. 19, 2007). Because Plaintiffs Mosdos and YCC submitted their answer while the case was pending in federal court, they were "required to set up [their] defenses and compulsory counterclaims, if any, subject to the terms and exceptions of Rule 13." *Donnkenny, Inc. v. Nadler*, 544 F.Supp. 166, 169 (S.D.N.Y.1982); *see also* Fed. R.Civ.P. 81(c) (stating that the Federal Rules of Civil Procedure govern after removal); *Sage Realty Corp. v. Ins. Co. of N. Am.*, 34 F.3d 124, 129 (2d Cir.1994) (holding that Rule 13, and not New York law, governed the counterclaims in a case removed to Federal court). Rule 13(a)(1)(A) provides that:

> A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against any opposing party, if the claim ... arises out of the transaction or occurrence that is the

subject matter of the opposing party's claim . . . .

Fed.R.Civ.P. 13(a)(1)(A). "[A]n absolute identity of factual backgrounds" is not required to render a counterclaim compulsory. *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir.2004) (quoting *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir.1979)); *see also MMZ Assocs., Inc. v. Gelco Corp.*, No. 06–CV–3414, 2006 WL 3531429, at *3 (S.D.N.Y. Dec. 8, 2006) ("Although this action and the Minnesota Action are not identical, combining the actions will serve the interest of judicial economy by preventing likely duplication of effort."). Rather, "[a] claim is compulsory if a logical relationship exists between the claim and the counterclaim and if the essential facts of the claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 699 (2d Cir.2000) (internal emphasis, brackets, and quotation marks omitted); *see also Jones*, 358 F.3d at 209 (noting that a claim is compulsory if it " 'arises out of the transaction or occurrence that is the subject matter of the opposing party's claim[,]' . . . and [the Second] Circuit has long considered this standard met when there is a logical relationship between the counterclaim and the main claim" (quoting Fed.R.Civ.P. 13(a)(1)(A))); *E.E.O.C. v. Amertac Holdings Inc.*, No. 03–CV–6128, 2007 WL 3165796, at *3 (S.D.N.Y. Oct. 10, 2007) ("[T]his standard [is] met when there is a logical relationship between the counterclaim and the main claim." (internal quotation marks omitted)). "If a party has a compulsory counterclaim and fails to plead it, the claim cannot be raised in a subse-

---

14. The Court notes that Plaintiffs have pursued their claims regarding the filing of the *Chestnut Ridge* Action against the Individual

Defendants in both their personal and official capacities. (Compl. ¶¶ 15–19, 21–22, 24, 26–27, 29–30, 72–75.)

quent lawsuit." *Critical–Vac Filtration Corp.*, 233 F.3d at 699.

Here, the claims asserted by Plaintiffs Mosdos and YCC were compulsory counterclaims that should have been raised (and, indeed, some were raised) as counterclaims in the *Chestnut Ridge* Action. In the *Chestnut Ridge* Action, the Defendant Villages claimed that Ramapo's enactment of the ASHL and the CZL violated various statutory and constitutional provisions and that the Ramapo Planning Board failed to comply with SEQRA in connection with YCC's site plan application. In their counterclaims in the *Chestnut Ridge* Action ("*Chestnut Ridge* counterclaims"), Plaintiffs Mosdos and YCC alleged the same factual background that forms the basis for this action—namely, in sum, that the operation of Kiryas Radin on the Nike Site is critical to Plaintiffs' religious practice, that the Villages have historically exhibited discriminatory animus against the Orthodox and Hasidic Jewish community, that Defendants mounted a racially-charged campaign to prevent Ramapo's enactment of the ASHL and CZL, and that after the enactment of the ASHL and CZL, the Four Village Plaintiffs filed the *Chestnut Ridge Action* out of discriminatory animus toward the Orthodox and Hasidic Jewish community. Defs.' Answer and Counterclaims ¶¶ 333–36, *Chestnut Ridge II* (S.D.N.Y. Oct. 19, 2007) (alleging that construction and operation of a rabbinical college on the Nike Site is critical to the religious practice of the Orthodox Jewish community); *id.* ¶¶ 337–42 (alleging that the Villages surrounding Ramapo incorporated in order to discriminate against the Orthodox Jewish community); *id.* ¶¶ 343–62 (explaining the background of Ramapo's adoption of its CZL and ASHL); *id.* ¶¶ 363–64 (alleging that Defendants had illicit motives in filing the *Chestnut Ridge* Action). Of particular relevance here, the *Chestnut Ridge* counterclaims alleged that

in "fil[ing]" suit to stop the promulgation of the [ASHL]," the Villages' "pretext … [was] environmental concerns, [but] the goal of the Village[s][was] to prevent the spread of the Orthodox and Hasidic communities through intimidation." *Id.* ¶ 363. The *Chestnut Ridge* counterclaims also alleged that "[t]he Villages' challenge to [Ramapo's] Recent Enactments, which are set forth in the instant lawsuit, was designed to create a forum to impede the development of Mosdos's Real Property through the use of the judicial process." *Id.* ¶ 367. Based on these factual allegations, Plaintiffs Mosdos and YCC asserted claims for injunctive relief under § 1983 for violations of the Free Speech and Free Assembly Clauses of the First and Fourteenth Amendments, RLUIPA, and the FHA. *See id.* ¶¶ 369, 373, 377, 381, 385–86. Based on the same factual allegations, Plaintiffs in this action have alleged claims under §§ 1982, 1983 and 1985 for violations of the Free Exercise and the Free Assembly Clauses of the First and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, RLUIPA, the FHA, the New York State Constitution, Article I, §§ 3 & 11, and New York Civil Rights Law Section 40–c, and they seek injunctive and compensatory relief.

The Second Circuit addressed a parallel factual scenario in *Critical–Vac*. *See* 233 F.3d at 700. In that case, the defendant, Minuteman, had previously filed suit against the plaintiff, Critical–Vac, for patent infringement. *Id.* at 698. After successfully defeating that action by showing that Minuteman's re-issue patent was fraudulently obtained, Critical–Vac filed suit against Minuteman, alleging that Minuteman engaged in antitrust violations by, inter alia, engaging in a sham litigation by filing the first action based on the fraudulently-obtained re-issue patent. *Id.* at 699. The Second Circuit affirmed the dismissal

of Critical–Vac's suit on the grounds that the claims were barred by the compulsory counterclaim rule. *See id.* at 700–04. In its analysis, the Second Circuit emphasized that there existed a "logical relationship" between Critical–Vac's sham litigation claims and "issues addressed by the earlier ... suit," e.g., the validity of Minuteman's re-issue patent. *Id.* at 700 (internal quotation marks omitted). Moreover, the Court noted that Critical–Vac did not "allege[ ] [in the second action] any facts that arose after the filing of its answer in the [prior patent infringement] litigation." *Id.*

Here, Plaintiffs allege that the *Chestnut Ridge* Action was a pretext for illegal actions by the Village Defendants. As in *Critical–Vac*, the question of whether the *Chestnut Ridge* Action is a mere pretext for illegal action is one that is logically intertwined with the validity of the Village Defendants' legal claims. Because the validity of these claims will be determined in the *Chestnut Ridge* Action, the "essential facts of the[se] claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues should be resolved in one lawsuit." *Id.* at 699 (internal quotation marks and emphasis omitted). Also, as in *Critical–Vac*, Plaintiffs "ha[ve] not now alleged any facts that arose after the filing of its answer in the [first] litigation." *Id.* at 700. Indeed, "all these facts were not only known to [Plaintiffs], they were pleaded in the first action." *Id.* (internal quotation marks and brackets omitted). Thus, Plaintiffs Mosdos and YCC were required to raise their claims against the Village Defendants as compulsory counterclaims in the *Chestnut Ridge* Action. Accordingly, those claims are hereby dismissed.

 A slightly different question arises with regard to Individual Defendants because these Defendants were not parties to the *Chestnut Ridge* Action. The answer turns on whether Individual Defendants, sued in their personal or official capacities, could be considered "opposing parties" within the meaning of Rule 13(a). The Court recognizes that the plain language of Rule 13(a) applies only to "opposing parties." *See* Fed.R.Civ.P. 13(a)(1) ("A pleading must state as a counterclaim any claim that ... the pleader has against an *opposing party* ...." (emphasis added)); *see also HID Global Corp. v. Leighton,* No. 07–CV–1972, 2007 WL 3566705, at *3 (N.D.Ohio Nov. 15, 2007) (allowing plaintiff to pursue claim against defendant who was "not an 'opposing party' within the plain meaning of Rule 13(a)"). The Second Circuit has extended the meaning of "opposing party" to encompass entities that are "one and the same for the purposes of th[e] litigation," such as when the non-party "acted as one" with the party that appeared in the previous action. *Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.,* 478 F.2d 191, 193 (2d Cir.1973) (finding that the Cuban government and its national bank acted as one entity for purposes of the litigation (internal quotation marks omitted)); *accord Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.,* 292 F.3d 384, 391 (3d Cir.2002) (noting that an unnamed party could be considered an "opposing party" for purposes of Rule 13 if it was "functionally equivalent" as the named party, controlled the previous litigation, or was "the alter ego of the named party"); *Peaktop Techs. (USA), Inc. S'holder Derivative Litig. v. Peaktop Int'l Holdings Ltd.,* No. 06–CV–8228, 2007 WL 700826, at *2–3 (S.D.N.Y. Mar. 6, 2007) (holding that claims against defendants who were not parties to the previous lawsuit were barred as compulsory counterclaims when, as a wholly-owned subsidiary, the defendant represented the "same interests" as the entity that was a party to the previous lawsuit).

Here, because claims against officials in their official capacities are duplicative of claims against governmental entities, *see Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978))), the Individual Defendants, when sued in their official capacities, are "one and the same" as the Village Defendants. As a result, the Individual Defendants in their official capacities are "opposing parties" within the meaning of Rule 13(a), and Mosdos's and YCC's claims against these officials are barred as unpled compulsory counterclaims. *See United States v. Phila. Marine Trade Ass'n/Int'l Longshoremen's Ass'n Vacation Fund*, 471 F.Supp.2d 518, 527 (E.D.Pa.2007) (finding that the United States was an "opposing party" and "should be bound by Rule 13(a)" when the plaintiff sued only the Commissioner of Internal Revenue Service because "the Commissioner of the Internal Revenue is clearly the functional equivalent of the United States and vice versa" (internal quotation marks omitted)).

▬▬ However, Defendants have asserted no argument, and the Court can think of none, supporting the proposition that the Individual Defendants, sued in their individual capacities, would be "functionally equivalent" to or "one and the same" as the Village Defendants. Indeed, the Second Circuit has recently noted that when a plaintiff sues in one capacity, a defendant may not assert a compulsory counterclaim against that plaintiff in a different capacity. *DEF v. ABC*, No. 08–CV–4908, 366 Fed.Appx. 250, 253, 2010 WL 567336, at *2 (2d Cir. Feb. 18, 2010) (upholding dismissal of counterclaim

brought against plaintiff in its "regulatory capacity" because the plaintiff, in this capacity, did not qualify as an opposing party under Rule 13 when plaintiff sued in "its capacity as assignee"); *see also Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 885 (2d Cir.1981) (holding that under the opposing party requirement, "when a plaintiff has brought suit in one capacity, the defendant may not counterclaim against [the plaintiff] in another capacity"). In sum, the Court declines to stretch the meaning of "opposing party" that far. *See GIA–GMI, LLC v. Michener*, No. 06–CV–7949, 2007 WL 1655614, at *4 (N.D.Cal. June 7, 2007) ("To accept the expansive definition of the term [opposing party] ... would erode [Rule 13's] clarity to the point that litigants would simply have to guess in each individual case whether a court would determine that a potential defendant to a counterclaim is an 'opposing party.'"); *Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*, No. 03–CV–1730, 2003 WL 22928602, at *4–5 (S.D.N.Y. Dec. 12, 2003) ("Unless defendants have clear notice as to what entities constitute an 'opposing party' under Rule 13, there is a danger that these defendants will later be unwittingly barred from asserting otherwise valid claims."), *adopted by* 2004 WL 194027 (S.D.N.Y. Feb. 2, 2004). Because the Individual Defendants, in their personal capacities, were not opposing parties in the *Chestnut Ridge* Action, Plaintiffs (including Mosdos and YCC) are not barred from bringing their claims against these Defendants. *See HID Global*, 2007 WL 3566705, at *3 (denying defendant's motion to dismiss on Rule 13(a) grounds when defendant was not an opposing party to the previous litigation); *First African Trust Bank, Ltd. v. Bankers Trust Co.*, No. 94–CV–4995, 1995 WL 422269, at *2 (S.D.N.Y. July 14, 1995) (finding that plaintiff's claim was not barred by the compulsory counterclaim

rule because the claim was brought against a defendant who was not a party to the previous action); *see also Noel v. Hall,* 341 F.3d 1148, 1170 (9th Cir.2003) (finding, under parallel state law compulsory counterclaim provision, that plaintiff's claim against a defendant who was a party to the previous litigation was barred, but that

plaintiff could bring his claim against the co-defendant, who was not a party to the previous litigation).[15]

In sum, Mosdos and YCC are barred by Rule 13 from bringing their claim regarding the filing of the *Chestnut Ridge* Action against the Village Defendants and the Individual Defendants as sued in their offi-

---

**15.** In their Reply Memorandum of Law, Defendants asserted, for the first time, that all Plaintiffs should be barred from suing all Defendants in this action because Defendants could have been brought in as necessary parties under Fed.R.Civ.P. 13(h) and 20. (Reply Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply") 8.) The Court, however, will not favorably consider an argument initially made in a reply brief. *See United States v. Yousef,* 327 F.3d 56, 115 (2d Cir.2003) ("We will not consider an argument raised for the first time in a reply brief."); *Estate of Morris ex rel. Morris v. Dapolito,* 297 F.Supp.2d 680, 689 n. 7 (S.D.N.Y.2004) ("[I]t is well settled that arguments may not be raised for the first time in a reply brief as that tactic denies the plaintiff the opportunity to respond."). In any event, Defendants throwaway reference to Rule 20, which applies to *permissive* joinder, was wholly unsupported by any explanation as to why Plaintiffs were "required" to join other Defendants in the *Chestnut Ridge* Action. *See* Fed.R.Civ.P. 20 (plaintiffs *"may* join in one action" if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction [or] occurrence" and if "any question of law or fact common to all plaintiffs will arise in the action"); *see also Briarpatch Ltd., L.P. v. Pate,* 81 F.Supp.2d 509, 515 (S.D.N.Y.2000) ("The decision whether to admit [ ] new parties [pursuant to Rule 20] is within the sound discretion of the trial court."). *But see Transamerica Occidental,* 292 F.3d at 393 (finding, without explanation, that plaintiffs' claims were barred against a defendant who was not an opposing party to the previous lawsuit because "Rule 13(h) would permit the joinder of [the defendant] as an additional party to the counterclaim"). Even though they did not invoke it, Defendants also did not explain why they would have been "necessary" parties to that action under Rule 19. *See Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 137 (E.D.N.Y. 2000) (denying motion to dismiss when Fed.

R.Civ.P. 19 did not "compel" joinder of join tortfeasors to the action and where "there c[ould] be a fair and just adjudication without the [joint tortfeasors] as parties" because "they [were], at most, permissive parties"); *cf. Rohm & Haas Co. v. Brotech Corp.,* 770 F.Supp. 928, 934 (D.Del.1991) (finding that plaintiffs claims were barred as compulsory counterclaims because Rule 13(h) "contemplates the situation where additional parties are *required* for the granting of complete relief" (emphasis added) (internal quotation marks omitted)).

On a related but distinct note, the Individual Plaintiffs (Bernstein and Ambers) were also not Parties to the *Chestnut Ridge* Action, and they are therefore not barred by Rule 13(a). The plain language of Rule 13(a) applies only to the "pleader" in the previous lawsuit. *See* Fed.R.Civ.P. 13(a)(1). Even applying the "functional equivalent" test sometimes used to determine the meaning of "opposing party," the Individual Plaintiffs are not "one and the same" as or alter egos of Mosdos or YCC, nor did they control the previous litigation. *See Sony Fin. Servs.,* 2003 WL 22928602, at *4 (noting that distinct entities or parties should not be considered "identical for purposes of Rule 13"); *cf. Banco Nacional,* 478 F.2d at 193 (non-party government was "one and the same" as the national bank for purposes of Rule 13). Even though the Individual Plaintiffs' interests regarding the New Hempstead Defendants were adequately represented by YCC for purposes of res judicata, the privity is not so strong as to make Individual Plaintiffs "pleaders" for purposes of Rule 13(a). *See HID Global,* 2007 WL 3566705, at *3 (noting that privity relationship was "insufficient" to render a claim compulsory under Rule 13); *McDowell v. Sec. Chimneys Ltd.,* No. 93–CV–1121, 1993 WL 498208, at *8 (N.D.N.Y. Nov. 29, 1993) (finding that plaintiff was not barred by Rule 13(a) from bringing claim because that particular plaintiff was not a party in the prior litigation).

cial capacities, and the Court dismisses these claims.[16] However, Mosdos and YCC are not barred by Rule 13 from bringing this claim against the Individual Defendants as sued in their personal capacities. Additionally, the Individual Plaintiffs are not barred by Rule 13 from bringing this claim against the Village Defendants and against the Individual Defendants, as sued in either their personal or official capacities.

### D. The First Amendment Right to Petition and the Noerr–Pennington Doctrine

Defendants argue that their pursuit of the *Chestnut Ridge* Action was protected by the First Amendment right to petition, and therefore, it cannot serve as a basis for liability on any of Plaintiffs' claims. The First Amendment provides that the government cannot abridge the right of the people to "petition the Government for a redress of grievances." U.S. Const. amend 1. The Supreme Court has made clear that the "right to petition [is] one of 'the most precious of liberties safeguarded by the Bill of Rights.'" *BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (quoting *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967)).

■ Among other things, the right to petition protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir.1994); *accord Citizens United v. Fed. Election Comm'n*, — U.S. ——, 130 S.Ct. 876, 907, — L.Ed.2d —— (2010) (noting that the First Amendment "protects the right . . . to petition legislative and administrative

bodies" (internal quotation mark omitted)). "A lawsuit can be a form of constitutionally protected petition for the redress of grievances." *Creek v. Vill. of Westhaven*, 80 F.3d 186, 192 (7th Cir.1996); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("The right of access to the courts is indeed but one aspect of the right to petition."); *United States v. Robinson*, No. 92–CV–345, 1995 U.S. Dist. LEXIS 22327, at *11–12 (D.Conn. Jan. 26, 1995) ("The filing of a complaint in court is a form of petitioning activity protected by the First Amendment."). As the Supreme Court has emphasized, however, not every lawsuit is entitled to the same degree of First Amendment protection. *See, e.g., BE & K Constr. Co.*, 536 U.S. at 530–33, 122 S.Ct. 2390 (noting that baseless litigation receives less protection under the First Amendment); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (noting that antitrust liability can be based on the filing of a "sham" lawsuit); *Bill Johnson's Rests., Inc. v. Nat'l Labor Relations Bd.*, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (holding that "baseless litigation is not immunized by the First Amendment right to petition.").

■ To determine whether the *Chestnut Ridge* Action constitutes protected activity, the Court also has considered the applicability of the *Noerr–Pennington* doctrine. The *Noerr–Pennington* doctrine derives from two antitrust cases decided by the Supreme Court, and is rooted in First Amendment principles. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136, 81 S.Ct.

---

**16.** The Court notes that even if Mosdos and YCC are not barred by Rule 13 from bringing this claim against Village Defendants or Individual Defendants as sued in their official capacities, the claim would be dismissed for the reasons explained below.

523, 5 L.Ed.2d 464 (1961) (holding that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive [or a court] to take particular action with respect to a law that would produce a restraint or a monopoly"); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."). "Under the *Noerr–Pennington* doctrine, litigation as well as concerted efforts incident to litigation may not serve as a basis for an antitrust claim." *Viva Optique, Inc. v. Contour Optik, Inc.,* No. 03–CV–8948, 2007 WL 4302729, at *2 (S.D.N.Y. Dec. 7, 2007); *see also T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.,* 312 F.3d 90, 93 (2d Cir.2002) ("The *Noerr–Pennington* doctrine generally immunizes from liability a party's commencement of a prior court proceeding." (citing *Cal. Motor Transp. Co.,* 404 U.S. at 510, 92 S.Ct. 609)).

The Second Circuit has yet to decide whether "the *Noerr–Pennington* doctrine . . . must be applied mechanically in cases outside the antitrust area." *Robinson,* 1995 U.S. Dist. LEXIS 22327, at *21; *see also T.F.T.F. Capital Corp.,* 312 F.3d at 94 (considering whether *Noerr–Pennington* immunity barred suit for tortious interference, but deciding that plaintiff failed to state a claim for tortious interference); *Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219 F.3d 92, 100 (2d Cir.2000) (noting that courts have "extended *Noerr–Pennington* to encompass concerted efforts incident to litigation," including "threat letters," and that *Noerr–Pennington* applies to "good faith litigation to protect a valid copyright"); *Hirschfeld v. Spanakos,* 104 F.3d 16, 19 (2d Cir.1997) (declining to decide whether "the *Noerr[– Pennington]* immunity doctrine extends to

non-commercial litigation" in a case alleging violations of § 1983); *Suburban Restoration Co. v. ACMAT Corp.,* 700 F.2d 98, 100–102 (2d Cir.1983) (noting that "whether the *Noerr–Pennington* doctrine is mandated by the United States Constitution" has not been "definitively resolved by the Supreme Court" or squarely addressed by the Second Circuit). However, the Second Circuit has acknowledged that the doctrine is "an application of the [F]irst [A]mendment," *Suburban Restoration Co.,* 700 F.2d at 101, and courts within the Second Circuit have held that it is therefore "relevant outside the context of antitrust actions," *Friends of Rockland Shelter Animals, Inc. v. Mullen,* 313 F.Supp.2d 339, 343 (S.D.N.Y.2004) (applying *Noerr–Pennington* doctrine where plaintiff claimed that "the defendant tortiously interfered with a prospective business advantage by lobbying a governmental entity"); *see also In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 685–86 (2d Cir.2009) (noting that under *Noerr–Pennington,* "citizen petitions are immune from antitrust liability in light of the First Amendment"); *Miracle Mile Assocs. v. City of Rochester,* 617 F.2d 18, 21 (2d Cir.1980) (noting "the First Amendment protections which underlie the *Noerr–Pennington* doctrine"); *Jackson Hill Road Sharon CT, LLC v. Town of Sharon,* 561 F.Supp.2d 240, 245 (D.Conn. 2008) ("Despite its antitrust origins, the [*Noerr–Pennington* ] doctrine has been held to protect the exercise of a defendant's First Amendment rights even when such action would normally constitute tortious interference."); *Tuosto v. Philip Morris USA Inc.,* No. 05–CV–9384, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007) ("*Noerr–Pennington* has also been applied to bar liability in state common law tort claims, including negligence and products liability claims, for statements

made in the course of petitioning the government." (citing *Hamilton v. Accu–tek*, 935 F.Supp. 1307, 1317 (E.D.N.Y.1996))); *DirecTV, Inc. v. Lewis*, No. 03–CV–6241, 2005 WL 1006030, at \*5–7 (W.D.N.Y. Apr. 29, 2005) (applying *Noerr–Pennington* in context of a claim under the Hobbs Act, 18 U.S.C. § 1951(a)).

The Second Circuit also has yet to address whether the *Noerr–Pennington* analysis applies to claims alleging civil rights violations, and courts within this Circuit have not reached consensus on this issue. *Compare Weiss v. Willow Tree Civic Ass'n*, 467 F.Supp. 803, 818–19 (S.D.N.Y.1979) (applying the reasoning of *Noerr–Pennington* to claims under §§ 1982, 1983, and 1985, and holding that state lawsuit filed by individual defendants was protected by the right to petition), *with LeBlanc–Sternberg v. Fletcher*, 781 F.Supp. 261, 267 (S.D.N.Y.1991) ("To allow individuals to avail themselves of [F]irst [A]mendment protections when it is alleged that their conduct will lead to official misconduct in violation of the United States Constitution would defeat the purpose of the civil rights laws.").

However, outside the Second Circuit, the majority of circuit courts have embraced the view that the *Noerr–Pennington* doctrine and related First Amendment protections bar liability for alleged violations of the civil rights laws. *See, e.g., Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644–45 (9th Cir.2009) (holding that government entity's lawsuit was protected by *Noerr–Pennington* doctrine in § 1983 action); *New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir.2007) (noting that "*Noerr–Pennington* has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the [F]irst [A]mendment's speech and petitioning clauses" and applying the doctrine to a § 1983 claim);

*Sanghvi v. City of Claremont*, 328 F.3d 532, 543 (9th Cir.2003) (applying *Noerr–Pennington* immunity to bar retaliation claims under § 1983 and the FHA); *Herr v. Pequea Twp.*, 274 F.3d 109, 119 (3d Cir.2001) (holding that *Noerr–Pennington* doctrine applies to municipality and affirming dismissal of § 1983 claim), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir.2003); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 860 (5th Cir.2000) (noting that *Noerr–Pennington* is a valid defense to § 1983 claims); *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir.2000) (holding that *Noerr–Pennington* immunity barred a suit under § 1983, noting that the "principle that led the Supreme Court to adopt the immunity principle in *Noerr* is equally applicable to the petitioning" at issue in that case); *Tarpley v. Keistler*, 188 F.3d 788, 796 (7th Cir.1999) (applying rationale of *Noerr–Pennington* to claims under § 1983, and noting that "Section 1983 claims, as much as the antitrust laws, are not appropriate vehicles for proscribing traditional political activity...."); *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir.1992) ("Under the *Noerr–Pennington* doctrine, liability may not be assessed under § 1983 or the anti-trust laws except in very limited circumstances, for actions taken when petitioning authorities to take official action, regardless of the motives of the petitioners...."); *Video Int'l Prod., Inc. v. Warner–Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir.1988) ("[W]e hold that any behavior by a private party that is protected from antitrust liability by the *Noerr–Pennington* doctrine is also outside the scope of section 1983 liability."); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th Cir. 1980) (holding that *Noerr–Pennington* immunizes "defendants from section 1983 liability for their conduct ..., which consist-

ed of demanding a zoning amendment and participating in the spread of false derogatory rumors about [a] proposed housing project"); *cf. Barnes Found. v. Twp. of Lower Merion,* 242 F.3d 151, 162 (3d Cir. 2001) ("[T]he uncertainty of the availability of a First Amendment defense when a plaintiff brings a civil rights case has now been dispelled. This point is of particular importance in land-use cases in which a developer seeks to eliminate community opposition to its plans as this opinion should make it clear that it will do so at its own peril."); *Stevens v. Tillman,* 855 F.2d 394, 404 (7th Cir.1988) (noting in dicta that the court "very much doubt[ed] that § 1985(3) properly may be used to penalize racially-motivated political campaigns, any more than the antitrust laws may be used to penalize deceitful campaigns to obtain protection from competition").

The Court concurs with the view of the majority of circuit courts that the framework of the *Noerr–Pennington* doctrine can be applied in the context of civil rights actions. In developing the *Noerr–Pennington* doctrine, the Supreme Court sought to protect conduct that falls within the ambit of the First Amendment right to petition, "regardless of intent or purpose" behind that conduct, so long as that conduct does not constitute sham activity. *Pennington,* 381 U.S. at 670, 85 S.Ct. 1585; *see also Prof'l Real Estate Investors,* 508 U.S. at 58, 113 S.Ct. 1920 ("Our decisions [ ] establish that the legality of objectively reasonable petitioning directed toward obtaining governmental action is not at all affected by any [ ] purpose [behind the petitioning.]" (internal quotation marks omitted)); *Cal. Motor Transp. Co.,* 404 U.S. at 512, 92 S.Ct. 609 ("The nature of the views pressed does not, of course, determine whether First Amendment rights may be invoked . . . ."); *accord Eaton,* 975 F.2d at 298 ("A citizen's right to petition is not limited to goals that are deemed wor-

thy . . . ."). Put differently, the First Amendment interest in protecting legitimate petitioning activity is no less important just because of the subject matter, content, or viewpoint of the petition. *See Cal. Motor Transp. Co.,* 404 U.S. at 511, 92 S.Ct. 609 (" 'The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.' " (quoting *Noerr,* 365 U.S. at 138, 81 S.Ct. 523)); *N.A.A. C.P. v. Button,* 371 U.S. 415, 444–45, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("[T]he Constitution protects expression and association without regard to the race, creed, or political or religious affiliation of the members of the group which invokes its shield, or to the truth, popularity, or social utility of the ideas and beliefs which are offered."); *Weiss,* 467 F.Supp. at 817 (holding that the First Amendment right to petition protected defendants' petitioning activities, noting "[t]he protection of the First Amendment does not depend on 'motivation' "). Of course, claims filed in the civil rights context also seek to protect important constitutional and statutory rights—in this case, the right to be free from racial and religious discrimination and the right to the free exercise of religion and association. However, a plaintiff's assertion, for example, of a violation of his or her constitutional right to be free from discrimination does not by itself strip a defendant of its First Amendment right to petition. *See Creek,* 80 F.3d at 192 ("[O]dd as it may seem, a racial motivation, to the extent that it lent an ideological hue to the lawsuit, could actually strengthen the case for regarding it as a form of petition for redress of grievances or as an exercise of freedom of speech."); *Video Int'l Prod., Inc.,* 858 F.2d at 1084 (noting that allowing liability under § 1983 for legitimate petitioning activity " 'would effectively cast a cloud over a

broad range of causes that are brought before courts, legislatures, or governmental agencies' "); *Gorman Towers, Inc.,* 626 F.2d at 614 ("We are loathe to interpret section 1983 to proscribe what we thus understand to be traditional political activity."). Rather, parties' competing constitutional and statutory rights require courts to balance carefully the interests at stake. *See Video Int'l Prod., Inc.,* 858 F.2d at 1084 (noting that the applicability of *Noerr–Pennington* immunity to § 1983 claims "presents ... difficulty aris[ing] from the fact that section 1983 itself protects constitutional rights, so [the court's] reasoning must involve a more careful balancing of interests").

 Of course, even the *Noerr–Pennington* doctrine does not grant unlimited license to those who wish, for allegedly discriminatory reasons, to exercise their right to petition. Indeed at its origin, *Noerr–Pennington* immunity extends only to activities (including litigation) that are not " 'a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor.' " *Prof'l Real Estate Investors,* 508 U.S. at 56, 113 S.Ct. 1920 (alteration in original) (internal quotation mark omitted); *see also T.F.T.F. Capital Corp.,* 312 F.3d at 93 ("There exists, however, an exception to the *Noerr[–]Pennington* doctrine for 'sham' litigation."). As the Supreme Court emphasized in *Bill Johnson's Restaurants,* "sham litigation by definition does not involve a bona fide grievance, [and] it does not come with the [F]irst [A]mendment right to petition. Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." 461 U.S. at 743, 103 S.Ct. 2161 (internal citations and footnotes omitted). A lawsuit falls within the "sham exception" to the *Noerr–Pen-*

*nington* immunity doctrine where "the litigation is (1) 'objectively baseless' and (2) intended to cause harm to the defendant 'through the use of governmental process—as opposed to the outcome of that process.' " *T.F.T.F. Capital Corp.,* 312 F.3d at 93 (quoting *Prof'l Real Estate Investors,* 508 U.S. at 60–61, 113 S.Ct. 1920) (brackets and emphasis omitted).

While the framework prescribed by *Noerr–Pennington* mirrors the First Amendment right to bring a viable lawsuit regardless of the underlying motivation, it also preserves the ability of those injured by such conduct to protect their constitutional or statutory rights when an objectively baseless lawsuit is brought, particularly when the lawsuit involves unlawful or discriminatory motivation. In contrast, denying such protection to any viable lawsuit, initiated even for allegedly improper reasons, would unnecessarily undermine First Amendment principles. *See Video Int'l Prod., Inc.,* 858 F.2d at 1084 ("[If] [F]irst [A]mendment petitioning could be challenged in the section 1983 context as a denial of equal protection, ... [or] a [F]irst [A]mendment violation, or other constitutional claim, [it would] vitiat[e] *Noerr–Pennington* protection."); David K. Godschalk, *Protected Petitioning or Unlawful Retaliation? The Limits of First Amendment Immunity for Lawsuits Under the Fair Housing Act,* 27 Pepp. L.Rev. 477, 516 (2000) (discussing the appropriate standard in determining whether to impose liability under the FHA for constitutionally protected petitioning activity, noting "[a] purely intent-based standard could prove unsupportable because it would fail to give sufficient deference to the state interest in hearing legitimate grievances concerning the application of its laws"); *see generally BE & K Constr. Co.,* 536 U.S. at 531–32, 122 S.Ct. 2390 (noting that the protections of the First Amendment right to petition do not hinge on whether

the lawsuit is successful, but rather on whether it is reasonably based and appropriately motivated). Accordingly, the *Noerr–Pennington* doctrine provides an appropriate framework within which to analyze claims alleging civil rights violations based on the filing of a lawsuit.

While *Noerr–Pennington* immunity can restrict civil rights claims based on a defendant's petitioning activity, the applicability of the *Noerr–Pennington* doctrine to the instant case is further complicated because Plaintiffs challenge the conduct of municipal actors (in addition to the Individual Defendants sued in their individual capacities). The Supreme Court has yet to decide whether or to what degree government actors are protected by the First Amendment, let alone whether such a right includes petitioning the courts. *See United States v. Am. Library Ass'n*, 539 U.S. 194, 212, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (declining to decide the question of whether government entities have First Amendment rights). The Second Circuit, however, has conferred some degree of protection to government petitioning activity under the *Noerr–Pennington* doctrine. In *Miracle Mile*, the Second Circuit held that the *Noerr–Pennington* doctrine immunized the City of Rochester and certain of its officials from liability for antitrust violations for their use of administrative proceedings under SEQRA to block use of certain property, noting that these defendants' motivation in such petitioning "does not eradicate the First Amendment protections which underlie the *Noerr–Pennington* doctrine." 617 F.2d at 20–21. Because *Miracle Mile* was decided in the traditional *Noerr–Pennington* context, however, it is unclear whether, in the Second Circuit, *Noerr–Pennington* protection for municipalities applies outside the antitrust context and to what degree the First Amendment right to petition extends to government actors.[17]

However, a more explicit recognition of a municipality's First Amendment right to

---

**17.** In *Suburban Restoration*, the Second Circuit dismissed the First Amendment language of *Miracle Mile* as dicta, and limited that holding as a straight-forward application of the statutory roots of *Noerr–Pennington*. 700 F.2d at 101 (noting that the *Suburban Restoration* panel was not bound by the First Amendment language of *Miracle Mile* because "it was not necessary to the holding[ ]" of that case).

The Second Circuit's decision in *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), however, supports the proposition that municipalities receive some degree of protection under the First Amendment right to petition the courts. In *Beretta*, the City of New York ("the City") and city officials filed a lawsuit against a group of firearms suppliers, seeking injunctive relief and abatement of the public nuisance allegedly caused by the defendants' distribution practices. *See id.* at 390–91. The defendants filed a motion to dismiss the City's Amended Complaint pursuant to the federal Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901–03, which directed the immediate dismissal of certain civil actions (pending as of October 26, 2005) filed against manufacturers or sellers of firearms distributed in interstate or foreign commerce, *see Beretta*, 524 F.3d at 389; *see generally* 15 U.S.C. § 7903(5)(A). In opposition to the defendants' motion to dismiss, the City argued that the PLCAA violates its First Amendment right to petition. *See Beretta U.S.A. Corp.*, 524 F.3d at 392–93. Although the Second Circuit rejected the City's argument that the PLCAA violated the right to petition, the court's analysis implicitly assumed that the City had such a right. *See id.* at 398. Specifically, in rejecting the City's First Amendment claim, the Second Circuit held that the PLCAA was constitutional because it merely immunized a "specific type of defendant from a specific type of suit." *Id.* The PLCAA, however, "[did] not impede, let alone entirely foreclose, general use of the courts by would-be plaintiffs such as the City." *Id.* Thus, the Second Circuit concluded, "the PLCAA cannot be said to deprive the City of its First Amendment right of access to the courts." *Id.*

petition the courts is found in *County of Suffolk v. Long Island Lighting Co.* *("LILCO"),* 710 F.Supp. 1387 (E.D.N.Y. 1989), *aff'd,* 907 F.2d 1295 (2d Cir.1990). In *LILCO,* Judge Weinstein concluded that "[a] municipal corporation . . . is protected under the First Amendment in the same manner as an individual." *Id.* at 1390 (applying *Noerr–Pennington* to immunize a municipality from RICO liability for petitioning to prevent the construction of a nuclear power facility).[18] Judge Weinstein's view of the First Amendment's protection for government actors has not been shared by all federal courts. Indeed, some courts have expressed doubt that the First Amendment's protections apply at all to government actors. *See, e.g., Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 139, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference; it confers no analogous protection on the [g]overnment."); *Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38, 61 (1st Cir.1999) (noting that "the First Circuit has expressed doubt [that governments can have First Amendment rights], holding that a legal services office of a state university lacks such rights, and saying that 'a state entity itself has no First Amendment rights'" (quoting *Student Gov't Ass'n v. Bd. of Trustees,* 868 F.2d 473, 481 (1st Cir.1989) (internal brackets omitted))), *aff'd, Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000);[19] *Warner Cable*

*Commc'ns, Inc. v. City of Niceville,* 911 F.2d 634, 638 (11th Cir.1990) (holding that a government "speaker is not itself protected by the first amendment"). Nevertheless, the Third, Seventh, and Ninth Circuits have explicitly held that the First Amendment right to petition and/or the correlative *Noerr–Pennington* doctrine protect government actors from liability for petitioning activity, including liability for alleged violations of the FHA, § 1982, and § 1983. *See New W.,* 491 F.3d at 722 (holding, in context of claims under § 1983, that "a municipality has a right to speak and petition for redress of grievances, so the *Noerr–Pennington* doctrine applies fully to municipal activities"); *Affordable Hous. Dev. Corp. v. City of Fresno,* 433 F.3d 1182, 1193 (9th Cir.2006) (holding that *Noerr–Pennington* barred municipal official from liability under § 1983 and FHA for petitioning activity); *Mariana v. Fisher,* 338 F.3d 189, 200 (3d Cir.2003) (holding that *Noerr–Pennington* protected the Commonwealth of Pennsylvania and its officials from liability for filing a lawsuit against certain tobacco companies); *Manistee Town Ctr.,* 227 F.3d at 1094 (holding that *Noerr–Pennington* immunity bars § 1983 liability for municipalities and municipal officials engaged in petitioning activity).

In concluding that *Noerr–Pennington* and the First Amendment right to petition protect government actors, the Ninth Circuit has emphasized the representative

---

**18.** While the Second Circuit mostly affirmed the judgments entered in *LILCO,* reversing only the attorneys' fees determination, it did not address the question of the county's First Amendment rights. *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1326–28 (2d Cir.1990).

**19.** In *Crosby,* the Supreme Court affirmed the First Circuit's holding that the Massachusetts law at issue was preempted by a federal stat-

ute. 530 U.S. at 388, 120 S.Ct. 2288. The Court did not address the First Amendment language in *Natsios,* which noted that the First Circuit had previously expressed doubt regarding whether government entities have First Amendment rights and that such First Amendment rights, if any, did not affect whether the state law was preempted. *See Natsios,* 181 F.3d at 61.

role that local government actors can play when petitioning:

> Government officials are frequently called upon to be ombudsmen for their constituents. In this capacity, they intercede, lobby, and generate publicity to advance their constituents' goals, both expressed and perceived. This kind of petitioning may be nearly as vital to the functioning of a modern representative democracy as petitioning that originates with private citizens.

*Manistee Town Ctr.*, 227 F.3d at 1093; *see also Mariana*, 338 F.3d at 200 (noting that "[g]overnmental petitioning is as crucial to the modern democracy as is that of private parties"); *Herr*, 274 F.3d at 120 (noting that when petitioning, "a township and its supervisors represent their constituents and facilitate their participation in the government process," and that a contrary rule would leave a townships' citizens "without a voice in important matters"). A similar view was expressed by Judge Weinstein in LILCO:

> [The municipality had] a constitutional right under the First Amendment to speak and act in opposition to [a project] ... [that in] [i]ts view ... represent[ed] a danger to [ ] residents ... [by] exercising its power to petition any agency of government including the legislature, administrative agencies and the courts.

*LILCO*, 710 F.Supp. at 1390. These considerations are relevant to the instant case given the Village Defendants' pursuit of claims under General Municipal Law § 239–m and SEQRA, as these provisions of state law confer municipalities with the ability to petition in this manner. Indeed, as the Second Department emphasized in affirming Village Defendants' standing to

pursue the *Chestnut Ridge* Action, General Municipal Law § 239–m exists to "'bring pertinent inter-community and county-wide planning, zoning, site plan and subdivision considerations to the attention of neighboring municipalities and agencies having jurisdiction' [and] ... to facilitate regional review of land use proposals that may be of regional concern." *Chestnut Ridge I*, 841 N.Y.S.2d at 334 (quoting N.Y. Gen. Mun. Law § 239–m) (internal citation omitted). Likewise, SEQRA "specifically protect[s]" community character, and therefore the Second Department held that municipalities may sue "to protect their unique governmental authority to define their community character." *Id.* at 338–39. Thus, by pursuing litigation under these statutes, a municipality acts in its representative capacity to protect the interests of its local community. *See Chestnut Ridge I*, 841 N.Y.S.2d at 338 ("[A] municipality is more than the collection of pavement, pipes, and other improvements that make up its infrastructure[;] ... through the exercise of [its] powers ... [it] define[s] the character of the community for the benefit of its residents.").

As explained, the fact that speech is allegedly motivated by or may have overtones of discriminatory animus does not generally strip away the speaker's First Amendment rights. *See Creek*, 80 F.3d at 192 (noting that a racially motivated lawsuit may still be protected as an exercise of free speech).[20] However, while municipalities may be shielded by *Noerr–Pennington*, or the related First Amendment principles, their authority to petition (including their authority to initiate litigation) is limited by other constitutional provi-

---

**20.** To be clear, it would be greatly disturbing if Plaintiffs' allegations of Defendants' allegedly discriminatory motivation in bringing the *Chestnut Ridge* Action are proven to be true, and of course for purposes of the instant motion, the Court assumes them to be true. But, this does not change the First Amendment calculus.

sions. For example, the Equal Protection Clause of the Fourteenth Amendment serves as a bar to municipal conduct that discriminates on the basis of race. *See Perry v. Metro. Suburban Bus Auth.*, 390 F.Supp.2d 251, 261 (E.D.N.Y.2005) ("The Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir.1980))). Thus, municipal officials, even in their representative capacity, may not yield to, and act upon, the discriminatory wishes of their constituents. *See Creek*, 80 F.3d at 193 (suggesting in dicta that the First Amendment could not be interposed as a defense in a hypothetical case in which a government actor "writes the sheriff of the county urging him not to hire any black deputy sheriffs"). Put another way, "[s]peech by the government ... cannot be equated for all purposes to speech by an individual." *Id.* at 193–94; *see also* David Fagundes, *State Actors as First Amendment Speakers*, 100 Nw. U.L.Rev. 1637, 1676 (2006) ("Government speaks, but its twin capacities to both enrich and imperil the system of freedom of expression, along with its coercive authority, make it unlike any other speaker.").[21]

For example, a government actor may not be entitled to the full measure of First Amendment protection in the face of claims that it engaged in "selective" petitioning in violation of the Equal Protection Clause. Such a claim is akin to a selective enforcement claim, in which a plaintiff alleges that an otherwise valid law has been selectively enforced against him, but not against others similarly situated, based on impermissible factors. *See Zahra v. Town of Southold*, 48 F.3d 674, 683–84 (2d Cir. 1995) (explaining that the Equal Protection Clause bars government actors from singling out individuals or groups for selective treatment based on discriminatory motives, even when government actors are enforcing otherwise valid laws); *LeClair*, 627 F.2d at 609–10 (same); *cf. United States v. Al Jibori*, 90 F.3d 22, 25 (2d Cir.1996) (noting that while prosecutors retain "broad discretion" to enforce criminal laws, the Constitution prohibits a prosecutor from bringing charges based on "'an unjustifiable standard such as race, religion, or other arbitrary classification'" (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)) (internal quotation marks omitted)).

■ However, in light of the Second Circuit's willingness to extend *Noerr–Pennington* protection to government actors in *Miracle Mile*, and given the other decisions within and outside the Second Circuit described above, the Court is persuaded that government actors are afforded some measure of protection under the *Noerr–Pennington* doctrine and the First Amendment to petition when they

**21.** The Court notes that, to the extent that Plaintiffs have sued the Individual Defendants in their individual capacities for the filing of the *Chestnut Ridge* Action, the analysis is the same. *See Weiss*, 467 F.Supp. at 818 (extending *Noerr–Pennington* doctrine to individuals, who were not government actors, in § 1982 context); *see also Herr*, 274 F.3d at 119 (noting that while the existence of immunity for municipal corporations is unsettled, "[i]t is clear that public officials sued in their individual capacity are entitled to the immunity provided under the *Noerr–Pennington* doctrine."). The Court also notes that Plaintiffs' § 1985 claim does not change the analysis as the Supreme Court has held that there is no conspiracy exception to the *Noerr–Pennington* doctrine. *See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 382–83, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).

lawfully do so (i.e. when they are in compliance with other applicable constitutional provisions) in their representative capacity. The Court will not attempt to discern the precise boundaries of that protection here. Instead, it is enough to say that Defendants' pursuit of the *Chestnut Ridge* Action is the type of petitioning by a government actor that is entitled to some protection under *Noerr–Pennington* and the First Amendment, but that this conduct is limited by the sham exception recognized in the *Noerr–Pennington* framework. To repeat, a lawsuit falls within *Noerr–Pennington's* sham exception if "the litigation is (1) 'objectively baseless' and (2) intended to cause harm to the defendant 'through the use [of] governmental process—as opposed to the outcome of that process.'" *T.F.T.F. Capital Corp.*, 312 F.3d at 93 (quoting *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 60–61, 113 S.Ct. 1920) (emphasis omitted). "'Thus, to obviate Noerr[-Pennington] immunity, a plaintiff must demonstrate both the objective and the subjective components of a sham.'" *La. Wholesale Drug Co. v. Sanofi–Aventis*, No. 07–CV–7343, 2008 WL 4580016, at *3–4 (S.D.N.Y. Oct. 14, 2008) (quoting *Prof'l Real Estate Investors*, 508 U.S. at 60–61, 113 S.Ct. 1920) (internal brackets omitted). Plaintiffs have alleged that Defendants' goal in pursuing the *Chestnut Ridge* Action was "to impede the development of [the Nike Site] through the use of the judicial process" (Compl. ¶ 77), however "Defendants' subjective intent is irrelevant unless it is first found that the challenged litigation is objectively meritless." *Viva Optique, Inc.*, 2007 WL 4302729, at *2 (citing *Prof'l Real Estate Investors*, 508 U.S. at 57, 113 S.Ct. 1920). Here, the state court's issuance of injunctive relief in the *Chestnut Ridge* Action, which required that court to find a likelihood of success on the merits, *see Masjid Usman, Inc. v.*

*Beech 140, LLC*, 68 A.D.3d 942, 892 N.Y.S.2d 430, 431 (2009) (noting that a plaintiff seeking preliminary injunctive relief must show, inter alia, a likelihood of success on the merits), is fatal to Plaintiffs' claim that the *Chestnut Ridge* Action was objectively baseless. *See Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F.Supp.2d 600, 608 n. 2 (S.D.N.Y. 2002) ("[T]he fact that a state court granted a TRO and then a partial preliminary injunction precludes a finding that the litigation was 'objectively baseless.'"); *see also Boulware v. Nev. Dept. of Human Res.*, 960 F.2d 793, 798 (9th Cir. 1992) (explaining that while a finding of "success on the merits" is not necessarily dispositive of the sham inquiry, "[t]he fact that [the proponent of the challenged lawsuit] succeeded in obtaining an injunction from the ... trial court judge strongly suggests that the state court action was not baseless"); *Sugar Busters, L.L.C. v. Brennan*, No. 98–CV–1562, 1999 WL 109564, at *4 (E.D.La. Feb. 19, 1999) ("The court granted a preliminary injunction in the trademark-infringement action; thus, the lawsuit filed by Sugar Busters is not objectively baseless.").

None of this is changed by the subsequent decision by the New York Supreme Court to dismiss some of the Villages' claims regarding the ASHL and the CZL. *See Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co.*, 964 F.Supp. 624, 627 (D.Conn.1997) ("A losing lawsuit ... must not lead the reviewing court to 'engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation.'" (quoting *Prof. Real Estate Investors*, 508 U.S. at 60 n. 5, 113 S.Ct. 1920) (internal quotation marks omitted)). Nothing about the New York Supreme Court's recent decision suggested that the Villages' claims that were dismissed were,

in fact, frivolous. *See Krasnyi Oktyabr, Inc. v. Trilini Imports,* 578 F.Supp.2d 455, 475 (E.D.N.Y.2008) (noting that litigation was not objectively baseless, "although plaintiff's suit ... prove[d] unsuccessful[,] [in part because] plaintiff's claims had enough merit to survive defendants' motion to dismiss"). Indeed, given that the same judge had granted the *Chestnut Ridge* Plaintiffs' earlier request for a TRO, the inference from the absence of such a finding is to the contrary. And, in any event, the New York Supreme Court has determined there is merit to the claim that Ramapo erred in issuing the negative declaration as to the Nike site. *See Chestnut Ridge III,* at 15–19. Given this record, it cannot plausibly be alleged that Defendants' legal claims in the *Chestnut Ridge* litigation are objectively baseless.

 As noted above, however, the actions of municipalities in undertaking litigation must also be consistent with the Constitution. Thus, as relevant here, municipal officials may not pursue even potentially meritorious claims if they do so in a discriminatory fashion. One way that discrimination could be established, as discussed, is for Plaintiffs to demonstrate that the Village Defendants were improperly selective in litigating to protect their interests. To establish such a claim, Plaintiffs must allege that "(1) ... compared with others similarly situated, [they were] selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra,* 48 F.3d at 683 (internal quotation marks omitted); *see also Miner v. Clinton County,* 541 F.3d 464, 474 (2d Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1625, 173 L.Ed.2d 996 (2009). " 'A plaintiff gen-

erally must satisfy both elements to establish a claim of selective enforcement.' " *Washpon v. Parr,* 561 F.Supp.2d 394, 409 (S.D.N.Y.2008) (quoting *LaTrieste Rest. v. Vill. of Port Chester,* 188 F.3d 65, 70 (2d Cir.1999)). While Plaintiffs have alleged that Defendants had improper motives in pursuing the *Chestnut Ridge* Action, Plaintiffs have not sufficiently alleged that they were treated differently than others similarly situated. *See Deegan v. City of Ithaca,* 444 F.3d 135, 146 (2d Cir.2006) (explaining that to prove a selective enforcement claim, plaintiff must show that others similarly situated were treated differently); *LaTrieste Rest.,* 188 F.3d at 70 (noting that a plaintiff "ordinarily cannot establish an equal protection violation unless it shows that the Village consciously applied a different standard of enforcement to similarly situated establishments"); *Prasad v. City of New York,* No. 08–CV–3818, 2009 WL 1119412, at *4 (S.D.N.Y. Apr. 24, 2009) ("Where 'a plaintiff seeks to prove selective prosecution on the basis of race, he must show that similarly situated individuals of a different race were not prosecuted.' ") (quoting *Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir.2000)).

Here, Plaintiffs only allege that

[Defendant Villages] ... approved the development of over one thousand multifamily, high-density units in their own respective villages without any alarm over infrastructure or sewer capacity. In addition, an additional 1,200 units north of [Ramapo] are being, or have been connected to [Ramapo's] infrastructure. In addition, over eighty senior units were approved by the Villages throughout Ramapo without any opposition. These newly approved projects were not a concern to the Villages, as they are residential units not for Orthodox or Hasidic Jews.

(Compl. ¶ 56.) Yet, more than a bare allegation that other developments were treated differently is required. *See Prasad*, 2009 WL 1119412, at *4 (dismissing selective treatment claim of a nightclub despite allegation that "other nightclubs with 'far worse problems' were not subjected to the same types of complaints and sanctions" and noting that nightclub failed to allege that "these other clubs were 'similarly situated' to [plaintiffs' nightclub] in the sense of having received numerous sustained complaints"); *Ruston v. Town Bd. for the Town of Skaneateles*, No. 06–CV–927, 2008 WL 5423038, at *6 (N.D.N.Y. Dec. 24, 2008) (dismissing an action for failure to state a claim where plaintiff included only a bare allegation of selective enforcement, noting that "[t]his single allegation is insufficient to state a claim that defendant village treated others, with a high degree of similarity to plaintiffs, differently"); *Seabrook v. City of New York*, 509 F.Supp.2d 393, 402 (S.D.N.Y.2007) ("Plaintiffs' equal protection claim must fail in the absence of allegations by each plaintiff as to what conduct is at issue, what similarly situated individuals were treated differently, and how the City's conduct was irrational or motivated by animus."). Plaintiffs neither explicitly allege that these other developments were similarly situated to their proposed development, nor allege facts suggesting that they were similarly situated. For example, there is no allegation that the other developments were similar in size or scope to the proposed development, or that they were approved during the same time frame. More importantly, there is no allegation that the Villages allowed these developments to proceed without requiring SEQRA compliance, the basis of the Village Defendants' claim in the *Chestnut Ridge* Action.[22]

Thus, as currently alleged, the Court finds that Plaintiffs have not made out a claim that defeats Defendants' qualified immunity, as defined here, under the *Noerr–Pennington* doctrine and the First Amendment, to prosecute the *Chestnut Ridge* Action. Accordingly, the *Noerr–Pennington* doctrine and the First Amendment right to petition bar Plaintiffs from pursuing claims against Defendants for their filing of the *Chestnut Ridge* Action.[23] However, the Court finds that under the circumstances, Plaintiffs should be allowed leave to amend their Complaint to address this issue. Thus, the motion to dismiss is granted without prejudice.

### III. Conclusion

For the reasons discussed above, Defendants' Motions to Dismiss are granted without prejudice. The Clerk of Court is respectfully directed to terminate the pending Motions (Dkt. Nos. 31 and 35).

---

22. The Court notes that it is unclear from the Complaint whether Plaintiffs are suing the Individual Defendants in their individual capacities as current or former town officials, or simply as private citizens. The Court also notes that to the extent the Individual Defendants are sued as private citizens, *Noerr–Pennington* protection would apply to their wholly private conduct even if, as Plaintiffs allege, the Individual Defendants' motivations in bringing the lawsuit had discriminatory overtones. *See Creek*, 80 F.3d at 192 (noting that even a racially motivated lawsuit may still be protected as an exercise of free speech); *Weiss*, 467 F.Supp. at 818 ("The protection of the First Amendment does not depend on 'motivation' "). Perhaps Plaintiffs could clarify this issue in an amended complaint. Again, to be clear, the Court's recognition of a person's right to petition is not an endorsement of the contents of that petition.

23. Because the Court dismisses the remaining claims against the remaining Defendants (after resolving the standing issues), the Court need not address Defendants' argument that the Court should abstain in deference to the *Chestnut Ridge* Action.

Plaintiffs may file an Amended Complaint within 30 days of this Opinion and Order.

SO ORDERED.